### WELLS et al. v. UNITED STATES.

(Circuit Court of Appeals, Ninth Circuit. May 5, 1919.)

No. 3186.

1. CRIMINAL LAW ⟶1032(6), 1044—APPEAL--INDICTMENT—WAIVER.
    The objection that an indictment is bad for duplicity is waived, where defendant does not test the same by demurrer, motion to quash, or motion that an election be required, and the appellate court will not consider such objection.

2. CONSPIRACY ⟶34—To HINDER EXECUTION OF "LAW."
    In view of Const. art. 1, § 7, a joint resolution of Congress made and approved on April 6, 1917, declaring a state of war to exist between the United States and Germany, is a "law," within the scope of Criminal Code, § 6 (Comp. St. § 10170), denouncing the offense of conspiracy to oppose by force the authority of the United States, or by force to hinder and delay the execution of any law thereof.

    [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Law.]

3. INDICTMENT AND INFORMATION ⟶71—CERTAINTY.
    The true test of an indictment is, not whether it might possibly have been made more certain, but whether it contains every element of the offense intended to be charged and sufficiently informs the defendant of what he must be prepared to meet and, in case other proceedings are taken

---

⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

against him for a similar offense, whether the record shows with accuracy to what extent he may plead a former acquittal or conviction.

4. CONSPIRACY ☞43(11)—INDICTMENT.

An indictment charging that defendants, in violation of Criminal Code, § 6 (Comp. St. § 10170), conspired together to oppose by force the authority of the United States, and by force to prevent, hinder, and delay the execution of the joint resolution of Congress of April 6, 1917, declaring a state of war to exist with Germany, which in the second count specifically enumerated various acts, the execution of which defendants conspired to prevent, hinder, and delay, held to state with sufficient definiteness the manner in which the offense was to be committed.

5. CRIMINAL LAW ☞1158(1)—REVIEW—QUESTION FOR JURY.

It is for the trial court to say whether the evidence is sufficient to carry case to the jury.

6. CONSPIRACY ☞48—TO HINDER EXECUTION OF LAW—JURY QUESTION.

In view of National Defense Act, §§ 57, 79 (Comp. St. §§ 3041, 3044q), as well as Act Jan. 21, 1903, as amended by Act May 27, 1908, held, in a prosecution wherein defendants were charged with conspiring, in violation of Criminal Code, § 6 (Comp. St. § 10170), by force to prevent, hinder, and delay the execution of the joint resolution of Congress declaring a state of war to exist with Germany, etc., that the evidence was sufficient to take the case to the jury.

7. CONSPIRACY ☞45—EVIDENCE—ADMISSIBILITY.

Where defendants were charged with conspiring in violation of Criminal Code, § 6 (Comp. St. § 10170), to prevent, hinder, and delay the execution by force of the joint resolution declaring a state of war to exist with Germany, etc., by issuing circulars against conscription, the admission of a resolution introduced by one of the defendants at a meeting where organized workers demanded of the government exemption from military service of those who had conscientious objections to the war was proper, having a tendency at least to show defendant's attitude of mind toward conscription.

8. CONSPIRACY ☞45—EVIDENCE—ADMISSIBILITY.

Where defendants were charged with violation of Criminal Code, § 6 (Comp. St. § 10170), for conspiring by force to hinder, delay, and obstruct the execution of the joint resolution declaring a state of war with Germany, etc., evidence that one of the circulars they issued was found on the front porch of the witness' home, which was within a block of the boundary lines of the military reservation, held admissible to show distribution of the circulars.

9. CRIMINAL LAW ☞1170(1)—HARMLESS ERROR—EVIDENCE—EXCLUSION.

Where defendants were charged with violation of Criminal Code, § 6 (Comp. St. § 10170), for conspiring by force to hinder, delay, and obstruct the execution of the joint resolution declaring a state of war to exist with Germany, etc., and a defendant was permitted to testify fully concerning an organization against militarism of which he was a member, held, that the exclusion of what was done at local branches of the organization regarding conscription could not have harmed him or the other defendants.

10. CONSPIRACY ☞45—EVIDENCE—ADMISSIBILITY.

Where defendants were charged with violating Criminal Code, § 6 (Comp. St. § 10170), for conspiring by force to obstruct, hinder, and delay the joint resolution declaring a state of war to exist with Germany, and the prosecution relied on circulars advocating resistance to conscription, a letter written in reply to one written by defendant by a congressman, showing that he was opposed to conscription and offered to show defendants' good faith, was incompetent.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

11. CRIMINAL LAW ⟨⟩1043(2)—APPEAL—OBJECTION—OFFER OF PROOF.

An exception to the sustaining of an objection to a question to a witness cannot be considered, where it was not stated what the answer would be; the court not being advised as to the relevancy of the matter sought to be elicited.

12. WITNESSES ⟨⟩259—TESTIMONY FROM STENOGRAPHIC TRANSCRIPT.

A transcript of stenographic notes of an interview may be used by the one who took the notes only to refresh his memory.

13. CRIMINAL LAW ⟨⟩1169(1)—REVIEW—HARMLESS ERROR—ADMISSION OF EVIDENCE.

Where defendants were charged with conspiring, in violation of Criminal Code, § 6 (Comp. St. § 10170), to hinder, delay, and obstruct by force laws of the United States, including the joint resolution declaring a state of war to exist with Germany, the admission of a transcript of stenographic notes of an interview with one of the defendants *held* harmless; the matter being fully covered by other witnesses.

14. CRIMINAL LAW ⟨⟩829(1)—INSTRUCTIONS—REFUSAL.

The refusal of requested instructions covered by the charge given is not error.

15. CRIMINAL LAW ⟨⟩1038(1), 1056(1)—APPEAL—OBJECTIONS AND EXCEPTIONS TO CHARGE.

The appellate court will not ordinarily look into any objections to the charge, unless they are timely made, and exceptions are regularly saved to the rulings thereon.

16. CRIMINAL LAW ⟨⟩822(11)—INSTRUCTIONS AS A WHOLE—PRESUMPTION.

Where defendants were charged with conspiring, in violation of Criminal Code, § 6 (Comp. St. § 10170), to hinder, delay, and prevent by force the execution of the joint resolution of Congress declaring a state of war to exist with Germany, etc., and it appeared that they issued a circular against conscription, an instruction that defendants were presumed to know the law, and cannot shield themselves behind ignorance of the law, when considered with the charge as a whole, *held* not erroneous.

17. CRIMINAL LAW ⟨⟩822(11)—CONSPIRACY—INSTRUCTIONS AS A WHOLE—PRESUMPTION.

In a prosecution for conspiracy in violation of Criminal Code, § 6 (Comp. St. § 10170), to hinder, delay, and prevent by force the execution of laws of the United States, such as the joint resolution of Congress declaring a state of war to exist with Germany, etc., a charge that every person is presumed to intend the natural consequences of his own act *held* correct, when considered with the charge as a whole; the criminality of the act not depending on a particular intent, etc.

18. CRIMINAL LAW ⟨⟩822(7)—CONSPIRACY—INSTRUCTIONS AS A WHOLE.

Where defendants were charged with conspiring, in violation of Criminal Code, § 6 (Comp. St. § 10170), to prevent by force the execution, etc., of laws of the United States, as the joint resolution declaring a state of war with Germany, and it appeared that they issued a circular against conscription, an excerpt from the charge, that the effect of the circular could not be neutralized or limited by any motive or intent not connected therewith, when considered with the charge as a whole, *held* correct.

19. CRIMINAL LAW ⟨⟩814(1)—SEDITION—CONSPIRACY—INSTRUCTIONS.

Where defendants were charged with conspiring, in violation of Criminal Code, § 6 (Comp. St. § 10170), by force to prevent, hinder, and delay the execution of the joint resolution declaring a state of war to exist with Germany, etc., and they issued circulars against conscription, a charge on freedom of speech, referring to riots, *held* not open to attack, as being inapplicable; the court stating therein that it referred to riots merely for illustration.

⟨⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

20. CRIMINAL LAW ⊂⇒1137(3)—APPEAL—INVITED ERROR—INSTRUCTION.
    Where defendants requested a charge dealing with freedom of speech, they cannot attack a charge thereon as irrelevant; the giving of the same being invited.

In Error to the District Court of the United States for the Northern Division of the Western District of Washington; Jeremiah Neterer, Judge.

Hulet M. Wells and others were. convicted of conspiracy in violation of Criminal Code, §.6, and they bring error. Affirmed.

The plaintiffs in error, defendants below, were indicted by two counts, charged with conspiracy under section 6 of the Criminal Code (Act March 4, 1909, c. 321, 35 Stat. 1089 [Comp. St. § 10170]). The first count charges that the ·defendants, on April 25, 1917, conspired together and with sundry other persons "to oppose by force the authority of the United States, and by force to prevent, hinder, and delay. the execution of a law of the United States; that is to say," the defendants, naming them, did "conspire, confederate, and agree together, and with divers and sundry other persons to the grand jurors unknown, by force to prevent, hinder, and delay the execution of the joint resolution of Congress of the United States made and approved on the 6th day of April, A. D. 1917 [40 Stat. 1, c. 1], then and there declaring a state of war to exist between the United States and the Imperial German government, and directing and authorizing the President of the United States to employ the entire military and naval forces of the United States and the resources of the government to carry on war against the Imperial German government, and to then and there oppose by force the authority of the United States and the authority of the President of the United States in carrying into force and effect the provisions of the law then existing which related to the armed military and naval forces of the United States, and to then and there by force prevent, hinder, and delay' the execution of such acts of Congress enacted after the adoption of said resolution declaring war between the United States and the Imperial German government, hereinabove referred to, for the purpose of carrying into execution the plan and purpose of said resolution; it then and there being the purpose and intention of the said defendants, and each of them, together with such other persons as they might, or could, induce, incite, and encourage to cooperate with them in their plan, and to join their said conspiracy to oppose by force the authority of the United States, and to prevent, hinder, and delay the execution of the said joint resolution of Congress declaring war hereinabove referred to, together with such .other laws as then existed or as might thereafter be enacted in pursuance of said joint resolution of Congress declaring war, and it then and there was the further purpose, plan, and object of the said defendants, and each of them, to prevent by force the proper organization of armed military and naval forces of the United States, and the proper disposition of said force under and by virtue of the authorities of the United States in conducting said war so declared and resolved for by the said Congress of the United States."

The allegations of the second count are of similar import, except that they are more specific as to the laws, the·execution of which it is alleged the defendants conspired by force to prevent, hinder, and delay. These laws, as specified, are: First, the joint resolution of the Senate and House of Representatives declaring war between this country and Germany; second, the act of Congress approved June 3, 1916 (39 Stat. 166, c. 134), entitled "An act for making further and more effectual provision for the national defense, and for other purposes," special reference being had to sections 57, 59, and 111 of said act (Comp. St. §§ 3041, 3043, 3045); and, third, section 4 ·of the act of Congress approved January 21, 1903, entitled "An act to promote the efficiency of the military and for other purposes" (32 Stat. 775, c. 196), as amended by section 3 of the act of Congress approved May 27, 1908, entitled "An act to further amend the act entitled 'An act to promote the efficiency of

⊂⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

the militia and for other purposes,' approved January 21, 1903" (35 Stat. 399, c. 204). And in relation to these laws it is further alleged: "It then and there being the purpose and intention of the said defendants, and each of them, together with such other persons as they might or could induce, incite, and encourage to co-operate with them in their plan, and to join their said conspiracy, by force to prevent, hinder, and delay the duly authorized officers, agents, and representatives of the United States from putting into effect and executing the said laws hereinabove mentioned, and from calling forth and bringing into the military service of the United States persons subject and liable to service thereunder under the provisions of said laws, and to prevent, hinder, and delay by force the mobilization, organization, control, direction, and disposition of the armed military and naval forces of the United States in conducting said war against the Imperial German government."

The cause went to trial upon a plea of not guilty, resulting in a conviction of all the defendants. Prior to trial there was no demurrer or other plea or motion interposed to the sufficiency or regularity in form or otherwise of the indictment. The defendants prosecute a writ of error from the judgment entered upon their conviction.

Winter S. Martin and Wilson R. Gay, both of Seattle, Wash., for plaintiffs in error.

Robert C. Saunders, U. S. Atty., Clarence L. Reames, Sp. Asst. Atty. Gen., and Ben L. Moore, Asst. U. S. Atty., all of Seattle, Wash.

Before GILBERT and HUNT, Circuit Judges, and WOLVERTON, District Judge.

WOLVERTON, District Judge (after stating the facts as above). The first question presented here is whether the indictment by each count charges two or more distinct offenses. It is unnecessary at this time to analyze the indictment, read in connection with the statute under which it is drawn (section 6, Criminal Code), to determine whether or not it contains the statement of two or more separate and distinct offenses. It is sufficient to say that the objection was only raised by a motion to dismiss at the close of the government's case, on the ground that the indictment does not state facts sufficient to constitute an offense against the defendants, and a further motion at the close of the case for a directed verdict discharging the defendants, for the same reason.

[1] The objection that an indictment is bad for duplicity is waived by going to trial, unless previously tested by demurrer, motion to quash, or motion that the prosecution be required to elect between the offenses charged. The rule is thus stated in 12 Cyc. 762:

"The objection that an indictment is bad for duplicity should be made by demurrer, by motion to quash, or by motion that the prosecution be required to elect between the offenses, and a failure to do so waives the objection and it cannot be raised by motion in arrest of judgment."

See, also, United States v. Bayaud (C. C.) 16 Fed. 376.

The waiver intercepts any later objection made to the form of the indictment that it is bad for duplicity, and the defendants were precluded from interposing it at the time they sought to do so. For this reason, the court will not now further consider it.

[2] It is next contended that the indictment is not sufficient, for reasons following: First, that the joint resolution of Congress declaring

war against the Imperial German government is not a law, within the purview of section 6 of the Criminal Code; and, second, that both counts are bad, because lacking in specific and definite allegations showing in what manner the offenses were to be committed.

Article 1, § 7, of the Constitution, prescribes the requisites to be observed by which a bill introduced in either house of Congress shall become a law. It must pass both houses and be presented to the President. If he approves it, it becomes a law. If he returns it with his veto, it must be to the house in which it originated. The section then proceeds as follows:

"If after such reconsideration two-thirds of that house shall agree to pass the bill, it shall be sent, together with the objections, to the other house, by which it shall likewise be reconsidered, and if approved by two-thirds of that house, it shall become a law. But in all such cases the votes of both houses shall be determined by yeas and nays, and the names of the persons voting for and against the bill shall be entered on the journal of each house respectively. If any bill shall not be returned by the President within ten days (Sundays excepted) after it shall have been presented to him, the same shall be a law, in like manner as if he had signed it, unless the Congress by their adjournment prevent its return, in which case it shall not be a law.

"Every order, resolution, or vote to which the concurrence of the Senate and House of Representatives may be necessary (except on a question of adjournment), shall be presented to the President of the United States; and before the same shall take effect, shall be approved by him, or being disapproved by him, shall be repassed by two-thirds of the Senate and House of Representatives, according to the rules and limitations prescribed in the case of a bill."

While not passing upon the question directly, the Supreme Court has considered and treated joint resolutions as having the effect of law. For instance, the court, in considering a joint resolution suspending the operation of an act of Congress, says, in United States ex rel. Levey v. Stockslager, 129 U. S. 470, 475, 9 Sup. Ct. 382, 384 (32 L. Ed. 785):

"It [the joint resolution] had all the characteristics and effects of the act of March 2, 1867 [the act which the resolution suspended], which became a law by the approval of the President. Until Congress should further order, the operation of the act of March 2, 1867, was by the joint resolution effectually suspended."

So in Fourteen Diamond Rings v. United States, 183 U. S. 176, 184, 22 Sup. Ct. 59, 62 (46 L. Ed. 138), Mr. Justice Brown, in a concurring opinion with the Chief Justice who rendered the opinion of the court, speaking of the function of a joint resolution, says:

"While a joint resolution, when approved by the President, or, being disapproved, is passed by two-thirds of each house, has the effect of a law (Const. art. 1, § 7), no such effect can be given to a resolution of either house acting independently of the other."

The eminent Justice cites with approval 6 Op. Atty. Gen. 680, wherein Attorney General Cushing holds that:

While "joint resolutions of Congress are not distinguishable from bills, and * * * have all the effect of law, * * * separate resolutions of either house of Congress, except in matters appertaining to their own parliamentary rights, have no legal effect to constrain the action of the President or heads of departments."

The purpose of the resolution in question was weighty; it was designed to proclaim that a state of war existed between this government and Germany. It was designed to have, and by the intendment of Congress without question did have, the same effect and potency as if war had been declared by a regular act of Congress; otherwise, that body would, we may reasonably assume, have made the declaration by a regularly adopted act. We think that the resolution having the effect of law must be considered a law, within the meaning of section 6 of the Criminal Code.

[3, 4] Referring to the objection that the indictment fails to state definitely in what manner the offenses were to be committed, it is our opinion that the indictment itself, in both counts, completely answers it. We need not here repeat the language. It will be sufficient to call attention to the allegations of the purpose and intention of the alleged conspirators, which were to oppose by force the authority of the United States, to prevent, hinder, and delay the execution of the joint resolution of Congress declaring war, and to prevent by force the proper organization of armed military and naval forces of the United States, etc. This as to the first count. The second is equally explicit. The word "force" has a well-defined meaning, and it was not essential to the protection of the defendants, in their right to be so informed of what they were accused of doing as to enable them to concert their defense, that the pleader go further and state the particular manner in which the force was designed to be applied.

The true test of an indictment, says the Supreme Court, is, "not whether it might possibly have been made more certain, but whether it contains every element of the offense intended to be charged, and sufficiently apprises the defendant of what he must be prepared to meet, and, in case any other proceedings are taken against him for a similar offense, whether the record shows with accuracy to what extent he may plead a former acquittal or conviction." Cochran and Sayre v. United States, 157 U. S. 286, 290, 15 Sup. Ct. 628, 630 (39 L. Ed. 704). The principle has been applied by this court in Sheridan v. United States, 236 Fed. 305, 310, 149 C. C. A. 437.

The rule is especially applicable at the stage of the proceedings in which the question of the sufficiency of the indictment was raised here for the first time. Applying the rule, it is clear that the present indictment reasonably conforms to the requirement of the law. It serves to warn the defendants of what they are called upon to meet at the trial, and puts them into adequate possession of the facts charged to enable them properly to concert their defense. The indictment is therefore sufficient.

[5, 6] The next question presented for consideration is whether the trial court committed error in refusing to grant defendants' motion for a directed verdict, on the ground that the testimony does not show the commission of the offense charged. The testimony is all in the record, and it is for the court to say whether it is sufficient to carry the case to the jury for their determination.

In the trial court's charge to the jury, the two counts of the indictment were consolidated and treated as one offense. To this manner of

treating the case there seems to have been no objection, by either the government or the defendants. Proceeding upon this theory, the particular charge against defendants is that they conspired to oppose by force, and to prevent, hinder, and delay, the execution of the joint resolution of Congress of April 6, 1917, declaring that a state of war existed between the United States and the Imperial German government, authorizing the President to employ the entire naval and military forces of the United States and the resources of the government, and pledging the resources of the country for bringing the conflict to a successful termination; also the National Defense Act of June 3, 1916, section 57 of which provides that:

"The militia of the United States shall consist of all able-bodied male citizens of the United States and all other able-bodied males who have or who shall have declared their intention to become citizens of the United States, who shall be more than eighteen years of age, and, except as hereinafter provided, not more than forty-five years of age, and said militia shall be divided into three classes, the National Guard, the naval militia, and the unorganized militia." Comp. St. § 3041.

And section 79:

"If for any reason there shall not be enough voluntary enlistments to keep the reserve battalions at the prescribed strength, a sufficient number of unorganized militia shall be drafted into the service of the United States to maintain each of such battalions at the proper strength." Comp. St. § 3044q.

And also the act of January 21, 1903, as amended by the act of May 27, 1908, which authorizes the President, whenever the United States is in danger of being invaded by a foreign nation, to call forth the state militia to repel such invasion.

Keeping this statement in mind as a premise, we will give attention to the evidence. Let us emphasize, before proceeding, that force is an essential element of the offense, and likewise in the charge, and that mere solicitation or entreaty, without a purpose of applying or using force to accomplish the ends sought to be attained, is without the intendment of section 6 of the Penal Code, under which the indictment is drawn.

In the latter part of April and early in May, 1917, meetings were assembled in Seattle, Wash., under the auspices of an association of persons known as the "No Conscription League." At these meetings there was prepared and adopted by the league a circular entitled "No Conscription, No Involuntary Servitude, No Slavery." Twenty thousand of these circulars were printed, and persons attending the meetings circulated them in certain parts of the city, going from house to house and leaving them as they passed along. The circular reads as follows:

" 'Neither Slavery, nor INVOLUNTARY SERVITUDE, except as punishment for crime whereof the party shall have been duly convicted, shall exist within the United States or any place subject to their jurisdiction.'

"The above is a part of the organic Constitution of the United States. The President and Congress have no authority to set it aside. That can only be done by a majority vote of the Legislatures of three-fourths of the separate states. For the President and Congress to do it is to usurp the powers of autocrats and if unresisted means the abandonment of democracy and the destruction of the republic.

"We, signing this, are native-born citizens, within the age limit set for the first compulsory draft. They will make an army of us and send us to

compel you to enter the second draft, and some more of you to enter the third draft and so on until freedom is dead. Wake up! Stand by us now, for when we have become an army we will have ceased to think and we will shoot you if told to shoot you! Just so it is expected that we will shoot and kill our brothers in other lands and that we will die to restore the rapidly vanishing values to the investments of Wall Street bankers escaping service themselves—a plutocracy whose good fortunes we do not share, but for which we have suffered enough.

"Resist! Refuse! Don't yield the first step toward conscription. Better to be imprisoned than to renounce your freedom of conscience. Let the financiers do their own collecting. Seek out those who are subject to the first draft! Tell them that we are refusing to register or to be conscripted and to stand with us like men and say to the masters: 'Thou shalt not Prussianize America!'

"We are less concerned with the autocracy that is abroad and remote than that which is immediate, imminent and at home. If we are to fight autocracy, the place to begin is where we first encounter it. If we are to break anybody's chains, we must first break our own, in the forging. If we must fight and die, it is better that we do it upon soil that is dear to us, against our masters, than for them where foreign shores will drink our blood. Better mutiny, defiance and death of brave men with the light of the morning upon our brows. than the ignominy of slaves and death with the mark of Cain, and our hands spattered with the blood of those we have no reason to hate.

"SEATTLE BRANCH NO CONSCRIPTION LEAGUE, P. O. Box 225.

"Where is it written in the Constitution—that you may take the children from their parents—and compel them to fight the battles of any war in which the folly or the wickedness of the government may engage?"

The testimony tends to show that the defendant Wells was present at two or more of these meetings, and took part in discussions pertaining to the circular. He took the copy to the printer and had it printed, corrected the proof, and paid for the printing, part of it from his own funds, and part through collections made at one of the meetings. He also directed the delivery of the printed circulars at the hall where a later meeting was held, and himself distributed some of the circulars. Sadler was present at at least one of the meetings, that of May 11, 1917, and took part in the discussions along with Wells. The "No Conscription" circulars were on the table in the assembly room at the time, and a number of persons took them away for distribution, but that Sadler took any of them away with him does not seem to be confirmed. Morris Pass attended two or more of the meetings, and at one acted as secretary, collected part of the money to pay for printing the circulars, and turned what he collected and that which came into his hands for that purpose over to Wells. He also distributed some of the circulars. Joe Pass was present at one or two of the meetings, took part in the discussion respecting the circular, and tacitly assented to its distribution. We have not attempted a survey of all the testimony adduced at the trial.

The defendants contend that the purpose of the circular was to oppose the passage of the conscription act, then pending in Congress, peaceably and without the use of force in any way, and the testimony for defendants seems to support the view that the discussions at these meetings took that turn. If force was to be employed, the fact must be deduced from the wording of the circular and the activities of the

defendants in procuring its adoption and distribution among the people in Seattle. What was said in the discussions that took place pertaining to the nature and character of the document to be adopted has not been shown, except in a general way, and no other language of a seditious nature has been shown to have been uttered by the defendants, or any of them, unless the resolution that was introduced by Wells at the Labor Temple in Seattle, and adopted, demanding exemption from military service on the ground of conscientious scruples, can be so construed. We consider the inquiry, however, aside from the effect and purpose of this resolution.

Attention should be directed more particularly to the wording of the latter clauses of the circular beginning with "Resist! Refuse!" It will thus be seen that the language urging resistance to conscription is very strong, breathing defiance to the constituted authorities, and, considering along with it the energy displayed in procuring the adoption and wide distribution of the circular, there would seem to be scope for reasonable men to draw the inference that it was intended, by those who were instrumental in its preparation and distribution, that force should be employed, if requisite, against the carrying into effect of the declaration of war by Congress, in pursuance of which Congress was proceeding to put the Selective Draft Act upon the statute, and to oppose by force the authority of the President in putting into execution the law respecting the militia, as referred to in the indictment, and the laws themselves carrying such authorization. We think, therefore, the evidence was sufficient upon which to submit the cause to the jury. It was not necessary to show that force was actually employed, but only that there was a conspiracy entered into that contemplated the employment of force, as a means to the accomplishment of a common purpose to oppose the execution of a law of the United States, or the authority of the government to prosecute the war.

[7] Objection was interposed to the admission of a resolution that was introduced by Wells, on May 23, 1917, at a meeting of the Central Labor Council in the city of Seattle, wherein organized workers, among other things, demanded of the government exemption from military service of all those who had conscientious objections to the war, as prejudicial. It had a tendency to show Wells' attitude of mind towards the Conscription Act, at least, and was admissible for that, if for no other purpose.

[8] Another objection was interposed to the admission of the testimony of one Fraser, to the effect that he found one of the circulars on the front porch of his home, within a block of the boundary line of the Ft. Lawton military reservation, and that he showed it to a Mrs. Knight, also as prejudicial to defendants. It was proper to show the extent to which the circulars had been distributed, and this evidence was pertinent to that purpose.

[9] While the defendant Wells was on the witness stand, he was asked:

"What steps were taken by the local branches, by yourself and other members, with reference to opposing the Conscription Act?"

The government having objected, witness was not permitted to answer, and this is assigned as error. The local branches referred to were branches of a national organization of Socialists known as the "American Union against Militarism." Wells had testified that he had taken part in the movement, and had attended meetings of the local branch at different places in Seattle. The meetings were held before the declaration of war. The witness continued:

"The whole purpose of the society and of the defendant was to get before the people the opinions offered by those who were favorably disposed in their point of view to this movement to place it before Congress. This society continued its agitation up to the time it was seen that the country was about to get into the war. From that time until the declaration of war they confined their efforts to trying to bring about an honorable avoidance of the war. After war was declared by the United States, the society ceased all opposition to the war itself. After the war was declared, the organization kept together, because it was thought there would be many occasions which would arise from time to time which would require the liberty of the people to be safeguarded. It was thought that conscription would quite likely become one of the issues, and that the society and its members should endeavor to prevent the enactment of such a law."

Wells having testified fully touching the organization known as the "American Union against Militarism," it was not essential to inquire in detail as to what was done at the local branches and by the members thereof touching the Conscription Act. He was permitted to explain fully what part he took in opposing that act, and the inquiry sought to be made could not appreciably help him or the other defendants. Otherwise, the issue sought to be injected into the trial was collateral in its scope, and irrelevant.

[10] It further developed that the defendant Wells, in his opposition to the adoption of the Conscription Act, wrote letters to members of Congress, and especially to Congressman Dill, who wrote defendant in reply. Counsel sought to introduce the letter from Dill, but was not permitted by the court to do so. The declared purpose in introducing the letter was to show that Dill agreed with Wells in his views on conscription, and that Wells was acting in good faith in opposing the measure. If it was relevant for him to show that others agreed with him, it should have been done by the sworn testimony of other witnesses. It was wholly incompetent to prove the fact by unsworn ex parte statements of the kind.

[11] Anna Louise Strong, a witness for defendants, was asked as to the purpose of the local branch of the general organization of the Union against Militarism. She was not permitted to answer, over the objections of the government, and error is assigned. It was explained by defendants' counsel that the question was preliminary, for the purpose of leading up to other questions. The exception is without merit, for the reason that it is not stated what the witness would have testified in answer to the question, and the court is not advised as to the relevancy of the matter sought to be elicited.

[12, 13] Frank B. Greene, who was a stenographer and engaged in the Secret Service department of the United States, being called as a witness for the government, testified that he, with others, interviewed defendants Joe and Morris Pass in New York, and that at the time he

took what was said at the interview in shorthand, and subsequently transcribed it. He related what the Pass brothers said to him, which testimony was admitted in evidence without objection. Joe and Morris Pass were witnesses in their own behalf, and while on the stand (and especially Joe Pass) disputed the correctness of Greene's testimony touching parts of the interview in New York. Greene was recalled in rebuttal, and interrogated as to Joe Pass' rendition of the interview, and the government was thereupon permitted, over objection, to introduce the transcript of the notes of the interview in evidence. The action of the court in this respect is also assigned as error. Technically the transcript should not have gone in, because the notes of the interview could be used by Greene only for one purpose, namely, that of refreshing his memory in case he was unable to testify from his independent recollection, and not as substantive testimony of what was said there. But the field of the interview seems to have been quite fully covered by Greene and the Pass brothers, and for this reason it is not apparent wherein the defendants have been injured by the introduction of the notes themselves. The error was therefore harmless. The exception saved to the refusal of the court to permit Greene to testify as to what the notes contained was without merit, as the notes showed for themselves what they contained.

We come now to the instructions of the court. The defendants, through their counsel, requested the court to give certain instructions, which were prepared and requested to be given in a former case. In that case two of the defendants here were indicted by five counts. Count 1 charged a conspiracy to violate section 211 of the Penal Code (Comp. St. § 10381); count 2 the same; count 3 to violate section 6 of the Penal Code, by conspiring to prevent, hinder, and delay the execution of the joint resolution of Congress of April 6, 1917; count 4 substantially the same; and count 5 charged seditious conspiracy, under section 6 of the Penal Code, to prevent, hinder, and delay the execution of the Selective Draft Act of May 18, 1917 (40 Stat. 76, c. 15 [Comp. St. 1918, §§ 2044a–2044k]). Some of such requested instructions were applicable in the present trial, but some were not.

[14] The first alleged error insisted upon is the court's refusal to give requested instructions 1 to 6, inclusive. Some of these are inapplicable here for any purpose. Those that are applicable have been disposed of by what has previously been said in this opinion. They relate to the sufficiency of the evidence to make a case for the jury.

The refusal to give a number of other requested instructions is assigned as error. Those insisted upon in the brief of counsel relate to requested instructions 8, 11, 13, 15, 16, 19, 20, and 21. As it relates to requested instructions 8, 11, 13, 15, and 16, we are persuaded that they are, so far as they state the law, adequately covered by the general instructions of the court. As to requested instruction 11, we shall have more to say when we reach the exceptions to parts of the general instructions. Requested instructions 19, 20, and 21 relate to the presumption of innocence, and the legal necessity of proving the defendants guilty beyond a reasonable doubt. They might properly have been given, and we think ought to have been. They are covered in

their essential features by the general instructions, but not so specifically or incisively. Yet, upon a careful reading of the entire instructions of the court, it is obvious that defendants have sustained no substantial injury by the court's refusal to give them.

We will notice now such assignments of error pertaining to the general charge as are properly predicated upon exceptions regularly and adequately saved thereto. Reference to the bill of exceptions will show that but three exceptions were even attempted to be saved to parts of the general instructions. These relate to what the court said, first, with reference to the use of force; second, with respect to the presumption of knowledge of existing laws; and, third, pertaining to freedom of speech.

[15, 16] The court will not ordinarily look into any objections to the charge, unless they are timely made and exceptions regularly saved to the rulings of the court respecting them. This eliminates consideration of all defendants' assignments of error relative to the general instructions, except such as are based upon the three exceptions above noted. The first two of the exceptions saved are directed to the following portions of the charge:

"If you believe or if you have reasonable doubt as to whether the 'No Conscription' circular set out in the indictment and admitted in evidence did not purpose to oppose by force or incite others to oppose by force and hinder and delay the President in the execution of the joint resolution of Congress, then, of course, you will not consider it in that connection. But if you believe beyond a reasonable doubt that the purpose and effect of the circular was to incite others by force to oppose, hinder, and delay the execution of such resolution, then such defendants who entered into such conspiracy would be guilty. In this connection I think I should say that the defendants are presumed to know the law, and cannot shield themselves behind ignorance of the law. The law requires that all persons know what the law is. You are also instructed that every person is presumed to intend the natural consequences or results of his acts deliberately or knowingly done.

"As stated, the indictment charges the defendants with conspiring to oppose by force the authority of the United States, and to hinder and delay the execution of its laws. You are instructed that this is an element which must be established by the testimony on the part of the government by the same degree of proof.

"Force need not be actual physical force manifested by the defendants, but must be such conduct, either acts, statements, invitations, or solicitations, the evident purpose of which is to incite others to the use of forcible resistance in hindering or delaying the government of the United States in the execution of its laws. It is not essential that the object of the conspiracy should actually have been accomplished, or that force should actually have been used. Nor is it essential that the conspirators should have agreed upon the precise method of employing force or the weapons or instruments of such force. If a conspiracy was formed, and the use of force was the natural or necessary means of accomplishing the object of the conspiracy, and if its use was necessarily incident to the carrying out of the plan of the conspiracy, whether that force should be used by the defendants, or only by those persons who should be induced to co-operate with them, then the defendants would be guilty of the offense charged. Nor can the effect of the circular be neutralized or limited by any motive or purpose or intent not communicated with the circular. Nor could what Webster or any one else said enter into this issue, or limit the effect of the circular, if the natural and reasonable conclusion to be deduced from the circular in evidence and what was done with it was to incite by force opposition to the law of the United States as charged.

"I think I should say in this connection, in view of the suggestions during the trial and argument, that you are not concerned in this case whether the war is right or not. We are at war now. There are only two sides to the war. One side is in favor of this country; the other side is against it. The policy of the government has been declared and established, and no person can by force do anything that will hinder or delay the government in carrying out that policy set out and defined in the resolution referred to in the indictment. The defendants are not charged with being against or in favor of the war, but with conspiracy by force to oppose, hinder, or delay the government of the United States in the execution of the resolution passed by the Congress with relation to the war and in carrying it to a successful termination."

The criticism directed to the first of these instructions is to that portion whereby the court told the jury that the defendants were "presumed to know the law and cannot shield themselves behind the ignorance of the law. The law requires that all persons know what the law is." It is urged that the publication of the circular in question could not be construed as inherently felonious per se, and that in criminal law every person is not presumed to know the law to such a degree as to impose upon him a felonious purpose when in fact he might have been ignorant of the law and have had no such purpose. Counsel discusses the publication of the circular as if it were directed against the Conscription Act, which had not then been adopted by Congress. Such was not the case, and such was not the theory of the prosecution, or the court. Indeed, the court elsewhere plainly told the jury that the conspiracy, if any were formed, could not be made to offend against the Conscription Act of May 18, 1917. The court gave no such intimation as that the publication of the circular was felonious per se. What the court said to the effect that defendants were presumed to know the law is common knowledge, and, when construed in connection with the entire charge, is not susceptible of the construction that counsel are disposed to place upon it.

[17] Further criticism is directed to the expression of the court that "every person is presumed to intend the natural consequences of his own act." This is a common instruction given in cases where the deliberate act of the defendant, by natural consequence, is to do an injury to another or to the government, and, as applied to this case, it has relation to the deliberate publication of a seditious circular. It is urged that the instruction was prejudicial, and that, while it is correct as an abstract legal proposition, it should not have been given in this case, citing Hibbard v. United States, 172 Fed. 66, 96 C. C. A., 554, 18 Ann. Cas. 1040, in support of the argument. That case, however, is one for devising a scheme with intent to defraud, and is clearly distinguishable from one like this. To show this, we need only quote from the opinion of the court on rehearing:

"The error consists in applying it [the instruction] to a case wherein, apart from the intent, the act is colorless; color-being thereby imparted, not to the intent by the color of the act, as the law implies, but to the act itself by the color borrowed from the intent. In cases like this where the act itself is, apart from the intent, colorless, the color of the intent must be proven as any other element of criminality is proven."

The present case is not one of that nature. It should be said that here the court elsewhere told the jury that this presumption was not conclusive, but probatory in character, and should be considered with all the other elements disclosed by the testimony in the cause. There was no error in giving the instruction.

[18] As it relates to the second part of the instructions above quoted, the criticism is directed to that particular clause where the court said:

"Nor can the effect of the circular be neutralized or limited by any motive or purpose or intent not communicated with the circular."

Standing alone, of course, this excerpt does not express the full or explicit meaning which the court designed to convey; but when read in connection with the clause following, and especially with what the court said on the subject of intent, the criticism loses its potency. Nor is the criticism of the court's instruction relative to the force essential to be manifested by defendants entitled to greater weight. The instruction on that subject is, in our opinion, a clear exposition of the law as applicable.

[19] The third reserved exception relates to the court's instruction respecting the subject of freedom of speech. It is covered by the fifteenth assignment of error. The objection goes to the incorporation into the court's instruction of what was said by the writer of this opinion, in instructing a jury in another case, in explaining the constitutional right of freedom of speech, and especially to the part of the instruction running as follows:

"But a citizen may not use his tongue or his pen in such a way as to inflict legal injury upon his neighbor or another. Nor has any person the right, under the guaranty of freedom of speech, to shape his language in such a way as to incite discord, riot, or rebellion, because such action leads to a breach of the peace, and disturbs good order and quietude in the community.

"But when his criticism extends, or leads by willful intent, to the incitement of disorder and riot, or to the infraction of the laws of the land or the Constitution of this country, or with willful purpose, to the resistance and obstruction of the due execution of the laws by the proper authorities, it overleaps the bounds of all reasonable liberty accorded to him by the guarantee of the freedom of speech, and this because the very means adopted is an unlawful exercise of his privilege."

It is urged that, while what was repeated from the writer's instruction was applicable in the case of riot, rebellion, or breach of the peace, it could not be applied so broadly as to be suited to the case at bar. The court's attention was called to this feature of the instructions, when it had concluded, and it took occasion to say that—

"Any reference in the instructions with relation to inciting to riot was simply given as a general definition of the term (freedom of speech), so that you will understand it, and you will understand that the reference should only apply to the charge in the indictment; that is, the conspiracy to, by force, hinder and delay the government as charged."

As thus explained, the criticism is untenable.

[20] Another objection to the entire instruction is that the question of freedom of speech is not involved in the issues of the case. Counsel,

however, cannot complain of this, if otherwise irrelevant, as they invited the instruction by their requested instruction No. 11.

Finding no error in the record, the judgment of the trial court will be affirmed.