UNITED STATES v. STRONG.

(District Court, W. D. Washington, N. D. January 13, 1920.)

No. 4924.

1. WAR ☞4—INDICTMENT FOR VIOLATION OF ESPIONAGE ACT INSUFFICIENT.
    An indictment for violation of Espionage Act, § 3, as amended by Act May 16, 1918, § 1 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 10212c), held not to charge an offense in any count.
2. WAR ☞4—WAR STATUS AS AFFECTING VIOLATION OF ESPIONAGE ACT.
    The war status at the time of the commission of the acts is a material consideration in determining charges of violation of the Espionage Act.

Criminal prosecution by the United States against Anna Louise Strong. On demurrer to indictment. Demurrer sustained.

Robt. C. Saunders, U. S. Dist. Atty., of Seattle, Wash.
John F. Dore and Mark M. Litchman, both of Seattle, Wash., for defendant.

NETERER, District Judge. [1] This is an indictment in ten counts. The first count charges the publication of an editorial in the Union Record, a daily newspaper, on the 4th of February, 1919, charged to be disloyal, scurrilous, and abusive, about the form of the government of the United States and the Constitution of the United States.

Count 2 is predicated on the same editorial, which, it is charged, was intended to bring the form of the government of the United States, and the Constitution of the United States, into contempt, scorn, contumely, and disrepute.

Count 3 charges the defendant, by the same publication, with intent to incite, provoke, and encourage resistance to the United States, when the United States was at war.

Count 4 charges the doing of all the acts enumerated in the preceding counts, in violation of the Espionage Act, predicated upon portions of the same article. All these acts were done, it is alleged, while the United States was at war.

Count 5 charges that the defendant did, on the 30th day of June, 1919, " * * * attempt to obstruct the recruiting and enlistment service of the United States by * * * writing and publishing" in the Seattle Union Record, a daily newspaper, the following:

---

"SIGNED.

By Anise.

There were sirens howling
And Bombs bursting
As a token
That the *treaty*
Was signed
That somewhere in Germany
A man had been found
Who could no longer *stand*
The sight
Of little white babies
*Starving*
And the sound of mothers
*Wailing*
And so at last he was willing
To put his name
To the ruthless bargain
To give away the lands
Of the *people*
To *doom*
Fifteen Million workers
To *death* or *exile*
By signing away the industries
To place a curse
Upon his children's children
Yes, he was willing
At *last*
But I wondered what he thought
As he faced
The *pitiless* victors
Gentlemen of the Allies
You *have us!*
We look at the vast sea
Of small dead faces
And there is no strength
Left in us
There is no bargain
So *atrocious*
That you cannot force it now
Upon us
But *beware*
Lest the day of *judgment*
Come for *you*
As it came for us
Lo! we bear witness
How sin is *punished*
And yet how small
How *inefficient* ·
Our Lusitanias seem
Beside your *starving*
Of a thousand cities
Your *seven months'*
Massacre
Of unsurrendered people
After the fighting was over!
Our *rulers* sinned
And therefore our children
*Perish*
But for the sins
Of *your rulers*

Shall not *your* children pay?
And I thought: 'Let us face
At last the naked fact.
*They* were like beasts
And *we* were like beasts.
We won, thank God, not they!
And we take
What we *choose*
Even as they would have done
By law of club and fang,
But there is *no honor left*
And no high sounding alms
  For *any* of us."

Count 6 is predicated on the same article, and charges disloyal, scurrilous, and abusive language about the form of government of the United States, the Constitution of the United States, and the military and naval forces of the United States.

Count 7 is based upon portions of the same article, and charges "intent * * * to bring the form of the government of the United States, the Constitution of the United States, the military and naval forces of the United States, into contempt, scorn, contumely, and disrepute."

Count 8 charges "intent then and there to incite, provoke, and encourage resistance to the United States" by the same publication.

Count 9 charges all of the acts separately charged in counts 5, 6, 7, and 8, in violation of section 3 of the Espionage Act.

Count 10 charges "support and favor the cause of a country with which the United States was at war, to wit, the Imperial German Government, and the successors of the Imperial German Government, * * *" by the same publication.

The defendant has demurred to each count in the indictment on the ground that the facts stated do not constitute a crime; that more than one crime is charged in each count; that at the time of the publication of the articles the war had terminated, and the active operative provisions of the act had ceased; that the act upon which the charge is predicated is unconstitutional and violative of the First Amendment of the Constitution.

Counts 5 and 9 are clearly duplicitous. U. S. v. Dembowski (D. C.) 252 Fed. 894. The suggestion of defendant that the Espionage Act is violative of the First Amendment is not sustained. All of the other grounds in the demurrer may be discussed together.

This case was submitted with two other cases in which the Espionage Act was involved, and in which the Union Record is concerned. In the argument the preamble to the Constitution is quoted, and a "constant recurrence to fundamentals" is urged, and it is suggested that the Constitution guarantees unto each man his life, his liberty, and his property, and that the article clearly is a threat of overthrow of the government and the assumption of property without compensation.

It is conceded, I think, that the advocacy of anarchy and sedition, or overthrow of government, is no crime, under the general statutes or law as presently enacted, unless the acts amount to treason, rebellion, or seditious conspiracy; nor is advising or advocating unlawful ob-

struction of industry, or unlawful or violent destruction of private
property, a crime under the laws of the United States. The destruction
of private property or the obstruction of industry might be a subject
for investigation by a court of equity, jurisdictional facts being pres-
ent. The offense, if any is charged, must be under the Espionage Act.
Section 10212c, Compiled Statutes, provides that—

"Whoever, when the United States is at war, * * * shall willfully
cause or attempt to cause, or incite or attempt to incite, insubordination, dis-
loyalty, mutiny, or refusal of duty, in the military or naval forces of the United
States, or shall willfully obstruct or attempt to obstruct the recruiting or en-
listment service of the United States, and whoever, when the United States
is at war, shall willfully utter, print, write or publish any disloyal, profane,
scurrilous, or abusive language about the form of government of the United
States, or the Constitution of the United States, * * * or any language
intended to bring the * * * government of the United States, or the Con-
stitution of the United States, or the military or naval forces of the United
States, * * * or the uniform of the army or navy of the United States
into contempt, scorn, contumely, or disrepute; or shall willfully utter, print,
write, or publish any language intended to incite, provoke, or encourage re-
sistance to the United States, * * *" shall be punished.

Each of the several acts charged in the indictment is made a separate
offense under section 3 of the act, supra, and each act is predicated
upon intent to do the prohibited thing. Intent of conduct is, therefore,
as held by all of the authorities, an ingredient of the charge. The
character of every act depends upon the circumstances in which it is
done. Aikens v. Wisconsin, 195 U. S. 194, 25 Sup. Ct. 3, 49 L. Ed.
154; Schenck v. U. S., 249 U. S. 47, 39 Sup. Ct. 247, 63 L. Ed. 470.
Is the language employed sufficient, if disseminated and adopted, to
produce the results condemned by the statute? Shaffer v. U. S., 255
Fed. 886, 167 C. C. A. 206.

The court will take judicial notice of the fact that open hostilities
ceased in the Great War on November 11, 1918, the day on which the
armistice was signed; that soon thereafter demobilization began and
continued; that the treaty of peace was signed at Versailles on June
28, 1919; and that it has not been ratified by the Senate, and that no
proclamation has been issued by the President declaring the war at an
end.

It is asserted by the defendant that hostilities having ceased, de-
mobilization proceeding, that the provisions of the Espionage Act be-
came thereby inoperative; while it is asserted by the government, in
view of the facts which the court judicially knows, the treaty of peace
had not been concluded, and is still pending before the Senate; that
the railways are still under national control by virtue of the war power;
that the Food Control Act has recently been amended; that the War
Time Prohibition Act has been upheld by the Supreme Court (Hamil-
ton, Collector, v. Ky. Distilleries & Warehouse Co. [Dec. 15, 1919] 251
U. S. 146, 40 Sup. Ct. 106, 64 L. Ed. ——); and that the conduct of the
defendant must be considered with relation to the provisions of the Es-
pionage Act, supra.

The Supreme Court in Hamilton v. Ky. Distilleries, supra, among
other things said:

"It is shown that many war-time activities have been suspended, that vast quantities of war materials have been disposed of, that trade with Germany has been resumed, and that the censorship of postal, telegraphic and wire communications has been removed."

It further says:

"That a statute valid when enacted may cease to have validity owing to a change of circumstances has been recognized, with respect to state laws, in several rate cases. Minn. Rate Cases, 230 U. S. 352, 33 Sup. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18; Missouri Rate Cases, 230 U. S. 474, 33 Sup. Ct. 975, 57 L. Ed. 1571; Lincoln Gas Co. v. Lincoln. 250 U. S. 256, 39 Sup. Ct. 454, 63 L. Ed. 968. That the doctrine is applicable to acts of Congress was conceded arguendo in Perrin v. U. S., 232 U. S. 478, 34 Sup. Ct. 387, 58 L. Ed. 691, and Johnson v. Gearlds, 234 U. S. 422, 34 Sup. Ct. 794, 58 L. Ed. 1383. In each of these cases Congress had prohibited the introduction of liquor into lands inhabited by Indians without specific limit of time. In one case, the prohibition was in terms perpetual. In the other, it was to continue 'until otherwise provided by Congress.' In both cases it was contended that the constitutional power of Congress over the subject-matter necessarily was limited to what was reasonably essential to the protection of the Indians."

The court, while assuming that since the power to impose a prohibition of this character was incident to the presence of the Indians, and their status as wards of the government, that it did not extend beyond what was reasonably essential to their protection, it followed that a prohibition valid in the beginning would become inoperative when, in the regular course, the Indians affected were completely emancipated from federal guardianship and control, and the decision rested upon the question as to what was reasonably essential to the protection of the Indians, and, if any considerable number remained, the question was primarily for the lawmaking body, which was vested with wide discretion.

The Prohibition Act (Comp. St. Ann. Supp. 1919, §§ $3115^{11}/_{12}f$– $3115^{11}/_{12}h$), Hamilton v. Ky. Distilleries, supra, is not a criterion by which the legal status of the Espionage Act (40 Stat. 217) can be determined, for the reason that the life of the act is determined by its own provision, which is: "Until the conclusion of the present war, and thereafter, until the determination of demobilization, the date of which shall be determined and proclaimed by the President of the United States;" and the same may be said of other war emergency legislation. The Emergency Shipping Fund Act June 15, 1917 (40 Stat. 182), as amended by Act April 22, 1918 (40 Stat. 535), and by Act Nov. 4, 1918 (40 Stat. 1020 [Comp. St. Ann. Supp. 1919, § $3115^{1}/_{16}d$]), "All authority * * * shall cease six months after a treaty of peace is proclaimed between this government and the German Empire." The Charter Rate and Requisition Act, July 18, 1918 (40 Stat. 913 [Comp. St. Ann. Supp. 1919, § $3115^{1}/_{16}f$]), "All power and authority * * * shall cease upon the proclamation of the final treaty of peace between the United States and the Imperial German government." The Railroad Control Act of March 21, 1918 (40 Stat. 451 [Comp. St. 1918, Comp. St. Ann. Supp. 1919, § $3115\frac{3}{4}n$]), " * * * Federal control * * * shall continue for and during the period of the war, and for a reasonable time thereafter, which shall not exceed one year and nine

months next following the date of the proclamation of the exchange of ratifications of the treaty of peace." The Food Control Act, August 10, 1917 (40 Stat. 276 [Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115⅛pp]), "Sec. 24. That the provisions of this act shall cease to be in effect when the existing state of war between the United States and Germany shall have terminated, and the effect and date of such termination shall be ascertained and proclaimed by the President." Trading with the Enemy Act of October 6, 1917 (40 Stat. 411 [Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½aa]), "The words 'end of war,' as used herein, shall be deemed to mean the date of proclamation of exchange of ratifications of the treaty of peace, unless the President shall, by proclamation, declare a prior date, in which case the date so proclaimed shall be deemed to be the 'end of the war' within the meaning of the act." Soldiers and Sailors Civil Relief Act of March 8, 1918 (40 Stat. 440, at 441 and 449 [Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3078¼s]), "(5) The term, termination of the war, as used in this act, shall mean the termination of the present war by the treaty of peace as proclaimed by the President. * * * Sec. 603: That this act shall remain in force until the termination of the war and for six months thereafter." Saulsbury Resolution, May 31, 1918, 40 Stat. 593, "That until a treaty of peace shall have been definitely concluded between the United States and the Imperial German government, unless in the meantime otherwise provided by Congress. * * *" Wheat Price Act of March 4, 1919 (40 Stat. 1348, 1353 [Comp. St. Ann. Supp. 1919, § 3115⅛kk(11)]), "That the provisions of this act shall cease to be in effect whenever the President shall find that the emergency growing out of the war with Germany is passed; and that the further execution of the provisions of this act is no longer necessary for its purposes, the date of which termination shall be ascertained and proclaimed by the President, but the date when this act shall cease to be in effect shall not be later than the first day of June, 1920."

The editorial set out in count 1 has relation to the industrial strike that was imminent in Seattle, and not to any war activities, and without, in any sense, approving any of the language or terms employed, I think a fair reading will convey the idea that the purpose was to show that the move was tremendous, and a grave responsibility rested upon those involved, and that the cause of the strike was not so much by reason of failure of local agreement as by "Eastern combinations of capital." No action was directed against the form of the government of the United States, or the Constitution, or any war activities. The statements that, while all labor would cease, yet "twelve great kitchens have been offered, and from them food will be distributed by the provision trades at low cost to all"; that "the milk wagon drivers and the laundry drivers are arranging plans for supplying milk to babies, invalids, and hospitals, and taking care of the cleaning of linen for hospitals"; and that "labor will preserve order; strike committees are arranging for guards, and it is expected that the stopping of the cars will keep the people at home"; and "a few hot-headed enthusiasts have complained that strikers only should be fed and the general public left to endure

severe discomfort. Aside from the inhumanitarian character of such suggestions, let them get this straight: Not the withdrawal of labor power, but the power of the workers to manage, will win this strike." It is apparent that to this point nothing has been said except that while the strike is universal, that exceptions will be made for the purpose of operating the twelve kitchens and driving the milk wagons and laundry wagons, and condemns the suggestions of "a few hot-headed enthusiasts," and that a committee has been appointed for the purpose of controlling the actions of the strikers; a committee of the membership to control its own membership. While the conduct in "tying up" all industrial activities may appear reprehensible, that does not make it a crime. This court in Alaska S. S. Co. v. International Longshoremen's Ass'n of Puget Sound et al. (D. C.) 236 Fed. 964, at page 972, in which the striking longshoremen were enjoined, said:

"While there is no testimony that any of these acts were expressly authorized, there is no evidence that the acts were disapproved, or members disciplined or expelled. The testimony does show that the defendants did have control of the situation, and did not exercise their influence or power to correct the irregularities, or disavow the acts until the issuance of the temporary restraining order, and service upon the defendants, when all overt acts ceased, which, considered with what the defendants did do, confirms the conclusion that the acts were under the authority and within the control of defendants. When persons or parties set in motion machinery for the purpose of shaping sentiment, they cannot take the benefits, without also being burdened with responsibilities. Such parties thereby assume the burden of controlling such agency, if within their power; and if, perchance, some persons unauthorized, acting with defendants, commit unauthorized acts, it is incumbent upon the defendants to show such fact, and, if committed by members under the control of the association, to disavow such acts by causing such offending members to be disciplined or expelled."

This is quoted with approval in Stephens v. Ohio Telephone Co. (D. C.) 240 Fed. 759, at page 777. The effort to control the strike membership, therefore, has judicial sanction. It is further said:

"Not the withdrawal of the labor power, but the power of the workers to manage, will win this strike." "What does Mr. Piez of the Shipping Board care about the closing down of Seattle's shipyards, or even of all of the industries of the Northwest? Will it not merely strengthen the yards at Hog Island, in which he is more interested? When the shipyard owners of Seattle were on the point of agreeing with the workers, it was Mr. Piez who wired them that if they so agreed *he would not let them have steel.* Whether this is camouflage we have no means of knowing. But we do know that the great Eastern combinations of capitalists *could afford* to offer privately to Mr. Skinner, Mr. Ames, and Mr. Duthie a few millions apiece in Eastern shipyards stock *rather than let the workers win.* The closing down of Seattle's industries, as a *mere shutdown,* will not affect these Eastern gentlemen much. They could let the whole Northwest go to pieces, so far as money alone is concerned. *But* the closing down of the capitalistically controlled industries of Seattle while the *workers organize* to feed the people, to care for the babies and the sick, to preserve order—*this* will move them, for this looks too much like the taking over of *power* by the workers. Labor will not only *shut down* the industries, but labor will *reopen,* under the management of the appropriate trades, such activities as are needed to preserve public health and public peace. If the strike continues, labor may feel led to avoid public suffering by reopening more and more activities, *under its own management.* And that is why we say that we are starting on a road that leads—*no one knows where.*"

This is charged to be disloyal, scurrilous, and abusive language about the form of the government of the United States and the Constitution of the United States. The various terms in the statute are defined as follows: Webster defines "disloyal" as "not true to." "Abusive," as "tending to deceive; practicing abuse; prone to ill treat by coarse, insulting words." "Scurrilous," "using the low and indecent language of the meaner sort of people; low indecency or abuse; mean; foul; vile." Synonym of vulgar; foul or foul-mouthed. Whatever may be said of the article, I do not think that it comes within the terms of the statute under this count.

"Contempt" is defined by Webster as "the act of contemning or despising; the feeling with which one regards that which is esteemed mean, vile, or worthless; disdain; scorn."

"Scorn" is defined by Webster as "to hold in extreme contempt, to reject as unworthy of regard; to despise; to contemn; to disdain."

"Contumely" is defined by Webster as "rudeness compounded of haughtiness and contempt; scornful insolence; despiteful treatment; disdain; contemptuousness in act or speech; disgrace."

"Disrepute" is defined by Webster as "loss or want of reputation; ill character; disesteem; discredit."

"Incite, provoke, and encourage resistance" is defined as follows: "Incite" means to move to action, to stir up, to spur or urge on. Webster's Dictionary. "Request," "advise," and "incite" are held in Long v. State, 23 Neb. 33, 36 N. W. 310, equivalent to the statutory words "aid, abet, and provoke." "Provoke" is defined by Webster "to call forth; to call into being or action." In State v. Warner, 34 Conn. 276, the court said: "To provoke is to excite, to stimulate, to arouse," as where violent language arouses the bad passions of another, and he replies in kind; strife; contention. "Provoke" is said in Cook v. State, 43 Tex. Cr. R. 182, 63 S. W. 872, 96 Am. St. Rep. 854, and Casner v. State, 43 Tex. Cr. R. 12, 62 S. W. 914, as meaning, in the ordinary sense, to excite to anger or passion, to exasperate, irritate, or enrage. "Encourage" is defined by Webster as giving courage to; inspiring with courage, spirit, or hope. "Resistance" is defined as the act of standing against or obstructing. "Encourage resistance" may be defined as the act of inspiring with courage to stand against or obstruct.

No argument is necessary to show that the language employed in no way attacked the form of the government or the Constitution of the United States; nor is an intent apparent to produce a clear and imminent danger that the substantive evils charged would follow, nor an attempt to inspire doing the forbidden things. Debs v. U. S., 249 U. S. 211, 39 Sup. Ct. 252, 63 L. Ed. 566; Schenck v. U. S., 249 U. S. 47, 39 Sup. Ct. 247, 63 L. Ed. 470; Frohwerk v. U. S., 249 U. S. 204, 39 Sup. Ct. 249, 63 L. Ed. 561; Abrams v. U. S., 250 U. S. 616, 40 Sup. Ct. 17, 63 L. Ed. 1173, filed Nov. 10, 1919.

The article set out in count 5 relates to the signing of the peace treaty. We have to do with it only as it relates to the criminal laws of the United States. What has been said as to the other counts is pertinent here, so far as applicable. The expression is clearly of opinion with relation to the peace treaty, and the natural and probable tendency of the lan-

guage employed is not calculated to produce the result condemned by the provisions of the statute charged in the indictment. Shaffer v. U. S., supra.

[2] The war status and circumstances with relation to hostilities had changed, and while it is not necessary, in this case, to decide on the question whether the Espionage Act was inoperative (decision on that question is reserved), the war status, however, is a material consideration in determining charges of violation of the Espionage Act.

The demurrer is sustained.[1]

[1] Plaintiff's citations: Abrams v. U. S. (Nov. 10, 1919) 250 U. S. 616, 40 Sup. Ct. 17, 63 L. Ed. 1173; Schenck v. U. S., 249 U. S. 47, 39 Sup. Ct. 247, 63 L. Ed. 470; Frohwerk v. U. S., 249 U. S. 204, 39 Sup. Ct. 249, 63 L. Ed. 561; Doe v. U. S., 253 Fed. 903, 166 C. C. A. 3; Debs v. U. S., 249 U. S. 211, 39 Sup. Ct. 252, 63 L. Ed. 566; Masses Pub. Co. v. Patten, 246 Fed. 25, 158 C. C. A. 250, L. R. A. 1918C, 79, Ann. Cas. 1918B, 999; War-Time Prohib. Case (Dec. 15, 1919) 251 U. S. 146, 40 Sup. Ct. 106, 64 L. Ed. ——; Stilson v. U. S. (Nov. 10, 1919) 250 U. S. 583, 40 Sup. Ct. 28, 63 L. Ed. 1154; U. S. v. Eastman (D. C.) 252 Fed. 232; U. S. v. Prieth (D. C.) 251 Fed. 946; Schulze v. U. S., 259 Fed. 189, 170 C. C. A. 257; Goldstein v. U. S., 258 Fed. 908, 168 C. C. A. 159; Coldwell v. U. S., 256 Fed. 805, 168 C. C. A. 151; Hickson v. U. S., 258 Fed. 867, 169 C. C. A. 587; Kirchner v. U. S., 255 Fed. 301, 166 C. C. A. 471; Williamson v. U. S., 207 U. S. 425, 28 Sup. Ct. 163, 52 L. Ed. 278; Dahl v. U. S., 234 Fed. 618, 148 C. C. A. 384.

Defendant's citations: U. S. v. Schutte (D. C.) 252 Fed. 212; Shaffer v. U. S., 255 Fed. 886, 167 C. C. A. 206; Herman v. U. S., 257 Fed. 601, 168 C. C. A. 551; Wells v. U. S., 257 Fed. 605, 168 C. C. A. 555; Wolf v. U. S., 259 Fed. 388, 170 C. C. A. 364; Abrams v. U. S., 250 U. S. 616, 40 Sup. Ct. 17, 63 L. Ed. 1173; Balbas v. U. S., 257 Fed. 17, 168 C. C. A. 229; U. S. v. Dembrowski (D. C.) 252 Fed. 894; Debs v. U. S., 249 U. S. 211, 39 Sup. Ct. 252, 63 L. Ed. 566; Joplin Merc. Co. v. U. S., 236 U. S. 531, 35 Sup. Ct. 291, 59 L. Ed. 705; U. S. v. Britton, 108 U. S. 199, 2 Sup. Ct. 531, 27 L. Ed. 698; Pettibone v. U. S., 148 U. S. 197, 13 Sup. Ct. 542, 37 L. Ed. 419; U. S. v. Hess, 124 U. S. 483, 8 Sup. Ct. 571, 31 L. Ed. 517; Foster v. U. S., 253 Fed. 481, 165 C. C. A. 193; Von Bank v. U. S., 253 Fed. 641, 165 C. C. A. 267; Tillinghast v. Richards (D. C.) 225 Fed. 226; U. S. v. McLaughlin (D. C.) 169 Fed. 302; Dwinnell v. U. S., 186 Fed. 754, 108 C. C. A. 624; Bryant v. U. S., 257 Fed. 378, 168 C. C. A. 418; U. S. v. Journal Co. (D. C.) 197 Fed. 415; Hyde v. U. S., 225 U. S. 347, 32 Sup. Ct. 793, 56 L. Ed. 1114, Ann. Cas. 1914A, 614; Report of Atty. Gen. Palmer to U. S. Senate, Nov. 14, 1919, The New Freedom, Woodrow Wilson.