### WOLF v. UNITED STATES.

(Circuit Court of Appeals, Eighth Circuit. May 13, 1919.)

No. 5192.

1. INDICTMENT AND INFORMATION ⬤⇒60—ALLEGATION OF FACTS.
    An indictment must allege facts sufficient to constitute the crime charged.

2. ARMY AND NAVY ⬤⇒40—ESPIONAGE ACT—VIOLATION BY WORDS ALONE.
    Words alone may constitute the overt act violative of the Espionage Act June 15, 1917, declaring interference or attempted interference with the creation and operation of the armed forces of the country a crime, though words which in their nature under the circumstances could not apparently have such tendency are without the statute; the intent with which they are uttered not alone making them harmful and legally obnoxious.

3. ARMY AND NAVY ⬤⇒40—ESPIONAGE ACT—INCITEMENT TO MUTINY—UTTERANCES.
    Utterances charged as violations of Espionage Act June 15, 1917, in that by them defendant attempted to cause disloyalty, insubordination, mutiny, and refusal of duty in the military forces of the United States, *held* not violative of the statute.

⬤⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

4. ARMY AND NAVY ⊜⇒40—ESPIONAGE ACT—OBSTRUCTION OF RECRUITING—UTTERANCES.

Utterances charged as violations of Espionage Act June 15, 1917, in that defendant thereby obstructed the recruiting and enlistment service of the United States, *held* not such as could obstruct recruiting and enlistment.

5. ARMY AND NAVY ⊜⇒40—SUFFICIENCY—TRUTH OF CHARGE.

In construing the sufficiency of a charge of violating Espionage Act June 15, 1917, the court is not concerned with the truth or falsity of the statement alleged to have been made by defendant.

6. ARMY AND NAVY ⊜⇒40—ESPIONAGE ACT—OBSTRUCTION OF RECRUITING—SUFFICIENCY OF INDICTMENT—"PUBLICLY."

Indictment charging a violation of Espionage Act June 15, 1917, in that defendant, to obstruct the recruiting and enlistment service, publicly stated the war with Germany was unjust, etc., *held* sufficient; "publicly" meaning in public, well known, open, notorious, common, or general, as opposed to private, secluded, or secret.

7. ARMY AND NAVY ⊜⇒40—ESPIONAGE ACT—OBSTRUCTION OF RECRUITING—INTENT—SUFFICIENCY OF EVIDENCE.

In a prosecution for violation of Espionage Act June 15, 1917, by utterances calculated to obstruct the recruiting and enlistment service, evidence *held* insufficient to show that defendant spoke with any intent to obstruct the service.

8. ARMY AND NAVY ⊜⇒40—ESPIONAGE ACT—EVIDENCE.

In a prosecution for violation of Espionage Act June 15, 1917, by utterances calculated to obstruct enlistment and recruiting and to cause mutiny, or refusal of duty, in the military forces of the United States, evidence concerning a certain flag incident, and serving to explain the circumstances under which defendant's statement covered by certain counts of the indictment was made, and to show that it was merely an angry, resentful outburst, *held* admissible under such counts.

9. CRIMINAL LAW ⊜⇒315, 371(1)—EVIDENCE—INTENT—PRIOR STATEMENTS—PRESUMPTION—CONTINUANCE OF STATE OF MIND.

In a prosecution for violation of Espionage Act June 15, 1917, testimony as to statements by defendant made a few weeks before the enactment of the statute, though ordinarily admissible as tending to show defendant's state of mind, ordinarily presumed to continue, *held* inadmissible, as it cannot be presumed that a lawful state of mind, unaccompanied by expressions showing willingness to violate law, will change into a criminal intent under a future statute.

10. ARMY AND NAVY ⊜⇒40—ESPIONAGE ACT—EVIDENCE.

In a prosecution for violation of Espionage Act June 15, 1917, testimony by defendant that he had not advised his sons not to enlist *held* inadmissible, in the absence of attempt by the government to prove for any purpose that defendant had so advised his sons.

11. CRIMINAL LAW ⊜⇒812—INSTRUCTIONS.

In prosecution for violation of Espionage Act June 15, 1917, instructions using language by way of illustration and explanation which ordinarily would have been proper, and covering certain situations shown in the evidence, which were not the particular ones covered by the indictment, tending to inflame and divert the jury, held erroneous.

In Error to the District Court of the United States for the District of South Dakota; James D. Elliott, Judge.

John H. Wolf was convicted of violation of the Espionage Act, and he brings error. Reversed.

⊜⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

James Brown, of Chamberlain, S. D., and Edward E. Wagner, of Sioux City, Iowa (George J. Danforth, of Sioux Falls, S. D., on the brief), for plaintiff in error.

George Philip, Asst. U. S. Atty., of Rapid City, S. D. (Robert P. Stewart, U. S. Atty., of Deadwood, S. D., and E. W. Fiske, Asst. U. S. Atty., of Sioux Falls, S. D., on the brief), for the United States.

Before SANBORN and STONE, Circuit Judges, and TRIEBER, District Judge.

STONE, Circuit Judge. John H. Wolf brings his writ of error from conviction on six counts for violation of the Espionage Act. Act June 15, 1917, c. 30, 40 Stat. 217. Concurrent sentences of five years were assessed for each of the six counts.

The assignments of error present the following points: (a) Unconstitutionality of this section (section 3 [Comp. St. 1918, § 10212c]) of the Espionage Act, because it is an attempt to define and enlarge upon the constitutional definition of treason; (b) insufficiency of the indictment; (c) insufficiency of the evidence; (d) improper admission and exclusion of evidence; (e) improper refusal to charge the jury as requested, and improper charge given.

(a) The objection to the validity of the Espionage Act does not extend to those counts of the indictment dealing with the obstruction of enlistment service, but is leveled at those counts relating to causing insubordination, disloyalty, mutiny, or refusal of duty in the military forces. In our judgment, these latter counts of the indictment are insufficient; hence the question of the validity of the statute drops out of the case.

(b) The indictment is challenged as stating no violation of the Espionage Act. The counts are in pairs, covering three separate utterances. Counts 1, 3, and 5 accuse him of causing, or attempting to cause, "disloyalty, insubordination, mutiny, and refusal of duty in the military forces of the United States." Counts 2, 4, and 6, respectively, charge that by the same statements he did "obstruct the recruiting and enlistment service of the United States." The charge in counts 1 and 2 is that at Kimball, S. D., on July 1, 1917, defendant stated in the presence of John Swason, J. M. Campbell, and "to other persons to the grand jurors unknown," as follows:

"That he, the said Swason, had better be careful about what he said as he may be under the Kaiser yet before this war is over; that this war was an unjust war on the part of the United States; that it was unjust on the part of the United States government to send the boys across the ocean to fight; that he, the said Wolf, had advised his own sons not to enlist until they were drafted; that the United States was entirely unjustified in its entrance into the present war and that Germany's attitude in her unrestricted submarine warfare was perfectly proper, both before and after the entrance of the United States into the war."

The charge in counts 3 and 4 is that at the same place, about July 25, 1917, he stated to Josiah Whittecar "and to other persons, to the grand jurors unknown," as follows:

" 'I would like to have a machine gun to turn into that bunch of sons of bitches. I'll bet I'd make them scatter,' he, the said Wolf, meaning thereby

and referring then and there to a number of the enlisted men of Troop L of the First South Dakota Cavalry, the exact number of whom are to the grand jurors unknown, and then and there being in the military service of the United States, and then and there being congregated near the place of business of the said Wolf, in the county and state aforesaid."

The charge in counts 5 and 6 is that at the same place, about July 15, 1917, he said to Mrs. Millie Currence, the mother of an enlisted man, and "to other persons to the grand jurors unknown," the following:

"That the government is crazy to think that he (the said Wolf) would fight against his own blood and they won't get any of my boys. You might just as well force the Catholic religion upon the Protestants as to force me to fight against my own blood (meaning thereby the Imperial German government); that the Red Cross is a bunch of scheming people; that he would not give anything and no one could compel him to; that the boys only enlisted for notoriety; that you can make as good citizens of your boys by keeping them at home and not sending them to war; that it was nothing for Mrs. Currence to be proud of that her boy had gone to war; that the war was all a graft and that it was an unjust war."

[1] The objections urged to the sufficiency of the various counts of the indictment are: (1) That there are no allegations that the statements charged were made in the presence of members of the military or naval forces, or of persons who might have become recruits, nor were there allegations that such statements were uttered under such circumstances as would naturally lead to the communication of them to such members or persons; (2) that the remarks were not such as would naturally cause the results condemned by the statute. It is elementary that an indictment must allege facts sufficient to constitute the crime charged.

[2-6] The law as first enacted and in force at the dates covered by the indictment was not a general disloyalty statute. The portion here involved had for its purpose prevention of interference with the creation and operation of the armed forces of the country. It declared such interference or attempted interference a crime. It has been repeatedly decided that words alone may constitute the overt act. Schenk v. United States, 249 U. S. 47, 39 Sup. Ct. 247, 63 L. Ed. 470: Frohwerk v. United States, 249 U. S. 204, 39 Sup. Ct. 249, 63 L. Ed. 561; O'Hare v. United States, 253 Fed. 538, —— C. C. A. ——; Doe v. United States, 253 Fed. 903, —— C. C. A. ——. Words which in their very nature, or which under the circumstances of their utterance, could not apparently have a tendency to cause such interference, are without the statute. The intent with which they are uttered cannot alone make them harmful. This law was intensely practical; it sought the utilitarian result of preventing actual interference or attempted interference. It did not concern itself about mere intentions, no matter how reprehensible. It comes fairly within the expression of Pollock, C. B., in Attorney General v. Sillem, 2 H. & C. 431, 525, that "human laws are made, not to punish sin, but to prevent crime and mischief." Therefore it is necessary that the words should be of a character and uttered under such circumstances as would apparently result in such interdicted interference. These two elements are essential to the offense, and therefore to a proper charge of the of-

fense. The effective way of pleading the character of the words is by setting them forth literally or substantially, as here done. If they carried to the hearers any hidden or special meaning, that should be alleged. The effective way of pleading the circumstances of utterance is by alleging such as show that the utterance was made to actual or possible members of such military forces, or under conditions where it would apparently reach or operate upon such persons. Within the latter class are the O'Hare Case (a public speech) and the Doe Case (an endless chain distribution of written or printed matter).

The character of the utterances as here set forth convinces that they could not cause disloyalty, insubordination, mutiny, or refusal of duty in the military forces, as charged in counts 1, 3, and 5. Nor does it seem possible that the scurrilous language covered by count 4 could have obstructed the recruiting and enlistment service. The language, or portions thereof, covered by counts 2 and 6, is different. It is in substance a statement that the war is an unjust war. We are not concerned with the truth or falsity of such statement (U. S. v. Equi, Charge to Jury, Bul. 172), but only with the effect it would apparently have upon the obstruction of recruiting and enlistment. Enlistment is a voluntary act, and anything which would tend to prevent a state of mind favorable thereto would be deterrent, and therefore an obstruction to such action. Certainly the belief that a war was unrighteous would ordinarily be a decided barrier to a resolution voluntarily to risk life in its prosecution. This has been recognized in the Doe Case and many other cases. Therefore, as to those two counts, the language, as alleged, is sufficient to constitute the offense, if uttered with the unlawful intent and under circumstances where it would apparently accomplish the forbidden results. The intent is properly alleged. The circumstances, as alleged, are that the statements were "publicly" made to certain named person or persons and "to other persons to the grand jurors unknown." "Publicly" means in public, well known, open, notorious, common, or general, as opposed to private, secluded or secret. The clear inference from the allegation would seem to be that the statement was uttered in the presence of a number of persons. There is no allegation that any of the immediate listeners were within the enlistment ages. The doctrine of the O'Hare and Doe Cases is that a statement to which wide publicity was given by the defendant would apparently reach men who might become recruits, and that it is unnecessary to prove, and therefore to allege, that such were actually present or actually were reached by the statements. Naturally the extent of publicity would be an important consideration and, within certain limits, decisive. The extent and character of the publicity must be such that the apparent result of the utterance would be obstruction of the recruiting and enlistment service. But these may be generally stated, subject to a bill of particulars in proper instances. No such bill was filed here, and the general allegations that the statements were publicly made to certain persons and to others unknown is sufficient.

[7] With counts 2 and 6 held sufficient, it is necessary to examine the other assignments of error in so far as applicable to them.

The sufficiency of the evidence is, in our judgment, properly challenged. There is no subtantial testimony in either instance of the slightest intention to obstruct the service. The intention necessary to be shown is willfulness—deliberate purpose. Defendant is a merchant in a town in South Dakota. The statement covered by count 2 occurred during a discussion of the war between defendant on one side and three acquaintances on the other. The other three approved the war; one of them had three sons then enlisted. It is very evident that the sole result which occurred, or really was to be expected, was that each of the four remained firm in his own conviction. The statute, as originally enacted, was not framed to prevent free discussion or expression of opinion, so long as such was not deliberately employed for the purpose of interfering with the creation and operation of the armed forces of the nation. The statement covered by count 6 was made in the defendant's home, in the presence of his wife, to a chore woman. It was an ill-natured, intemperate outburst, brought on by seeing Red Cross pictures in a magazine. The woman properly resented his language, and stated that she had a son who had enlisted, and that she was proud of it. The evidence in the entire case clearly shows an instance of a headstrong, willful man, who felt strongly about the war, and who insisted, in and out of season and in intemperate and sometimes scurrilous language, on voicing his views. It also clearly shows that the natural and only result thereof was to arouse the resentment of his neighbors to a point dangerous to himself; one manifestation being a sort of vigilante visit from members of the local guard organization, which occasioned the filthy, resentful outburst covered by counts 3 and 4 of the indictment.

[8] There are several assignents of error relating to the admission or exclusion of evidence. The evidence of Whittecar concerning the flag incident was competent and actually favorable to defendant, in connection with the charges in counts 3 and 4, since it served to explain the circumstances under which the statement covered by those counts was made, and that it was merely an angry, resentful outburst. It had no bearing on any other part of the case, and would be incompetent except for those counts.

[9] The court admitted evidence by Galbraith and by Lawton of statements by defendant made a few weeks before the enactment of this statute. Ordinarily such statements, made only a few weeks prior to those covered by the indictment, would be evidence bearing on intent, since it would tend to show his state of mind, which is presumed to continue. But it cannot be presumed that a state of mind, entirely lawful at the time and not accompanied by expressions showing a willingness to violate law, will change into a criminal intent under a future statute. State v. Wenzel, 72 N. H. 396, 56 Atl. 918; Rhodes v. State, 75 Tex. Cr. R. 659, 172 S. W. 252; Pooley v. Dutton, 165 Iowa, 745, 147 N. W. 154.

[10] Assignment 7 is to the refusal of testimony by the defendant to the effect that he had not advised his sons not to enlist. No attempt was made by the government to prove, for any purpose, that defendant had advised his sons not to enlist. Whether he did or not

was immaterial. The question here was whether he made, in substance, the statements alleged in the indictment. The testimony was properly excluded.

[11] Assignment 8 drops from the case with counts 3 and 4, to which it referred. Assignments 9 to 15, inclusive, relate to instructions refused or to the charge as given. Of these, 9 to 13, inclusive, have been fully covered by what has been said concerning the sufficiency of the indictment and of the evidence. Assignments 14 and 15 relate to language used in the charge which defendant claims tended to inflame and divert the jury. The language was used by way of illustration and explanation, and ordinarily would have been entirely proper. However, it covered certain situations shown in the evidence which were not the particular ones covered by the indictment—notably the so-called "flag incident." We think the criticisms well taken. The greatest danger to justice from a jury is through a confusion of the real issues in the case. This is peculiarly true when the times or circumstances or character of crime are such as to make jurymen lose sight of the questions of fact actually involved. It is natural, in time of war, when patriotic sentiment is high, that it is particularly difficult to secure a fair trial for men accused of crimes connected with the war. At such times the task of the court becomes especially difficult and requires great care to prevent miscarriage of justice. These are practical considerations, which must be constantly borne in mind, or the verdicts of juries in such cases will mistakenly become expressions of their hatred for unpatriotic acts in general, instead of their careful judgment on the facts shown by the evidence in the particular case. Patriotism must not become, even innocently, a cloak for injustice. The right of an accused in the courts of this nation to a fair trial must not vary with the character of the crime. The variation permitted is in the punishment, but that comes only *after* a fair trial.

With instructions to proceed in accordance with this opinion, the case is reversed.