## UNITED STATES v. PELLEY.

### SAME v. BROWN.

### SAME v. FELLOWSHIP PRESS, Inc.

Nos. 8086–8088.

Circuit Court of Appeals, Seventh Circuit. Dec. 17, 1942.

Writ of Certiorari Denied Feb. 15, 1943.

See —— U.S. ——, 63 S.Ct. 665, 87 L.Ed. ——.

Oscar F. Smith, of Indianapolis, Ind., and Floyd G. Christian, of Noblesville, Ind., for appellants.

B. Howard Caughran, U. S. Atty., of Indianapolis, Ind., and Henry A. Schweinhaut, Department of Justice, of Washington, D. C., for appellee.

Before EVANS, MAJOR, and KERNER, Circuit Judges.

EVANS, Circuit Judge.

Violations of the Federal Sedition law were the bases of the twelve count indictment, the verdicts of guilt, and the judgment of imprisonments and fine here appealed from.

*Parties.* There are three appellants, two of whom are individuals, and one, a corporation: William Dudley Pelley, president of the corporate defendant, and author of most of the criminal publications; Lawrence A. Brown, an incorporator and officer of the corporate defendant, research worker for the editorial material; and Fellowship Press, Inc., the instrumentality for publication of the offending material. A fourth defendant did not appeal. Appellants are citizens of the United States.

*Verdicts and Judgment.* Pelley was found guilty on all counts (save the sixth, which was dismissed) and was sentenced to fifteen years' imprisonment; Brown was found not guilty of all substantive counts and guilty of the conspiracy count and sentenced to five years' imprisonment; Fellowship Press was found guilty on all counts as charged in the indictment, and fined $5,000.

*The Statute.* Eleven counts of the indictment charged substantive violations of

the statute, Section 3, 50 U.S.C.A. § 33, and the final count, the twelfth, charged conspiracy to commit the substantive crimes, in violation of Section 4, 50 U.S.C. A. § 34. These sections read:

"Whoever, when the United States is at war, shall willfully make or convey false reports or false statements with intent to interfere with the operation or success of the military or naval forces of the United States or to promote the success of its enemies and whoever, when the United States is at war, shall willfully cause or attempt to cause insubordination, disloyalty, mutiny, or refusal of duty, in the military or naval forces of the United States, or shall willfully obstruct the recruiting or enlistment service of the United States, to the injury of the service of the United States, shall be punished by a fine of not more [than] $10,000 or imprisonment for not more than twenty years, or both." (Section 3.)

"If two or more persons conspire to violate the provisions of sections 32 or 33 of this title, and one or more of such persons does any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be punished as in said sections provided in the case of the doing of the act the accomplishment of which is the object of such conspiracy. Except as above provided conspiracies to commit offenses under this chapter shall be punished as provided by section 88 of Title 18." (Section 4.)

*The Indictment.* The gist of the substantive counts, couched in statutory terms, is the publication and dissemination of "false statements with intent to interfere with the operation or success of the military or naval forces of the United States or to promote the success of its enemies"; and "obstruct the recruiting or enlistment service of the United States" by distribut-

ing certain publications to persons eligible for military service. The twelfth count described a conspiracy to commit the substantive offenses. The sixth count was withdrawn by the Government because the proof required to substantiate the charge involved disclosure of naval secrets concerning our losses at Pearl Harbor.

Since the fact of publication is not challenged, the controversy is whether the statements are violative of the statutory censure. Also, inasmuch as the sentence was one which might have been pronounced upon a jury's verdict of guilt on each of the counts, we need consider specifically and at length only one count—the tenth—which seems to be the most specific and inclusive. This count first states the allegations of the first, second, and third paragraphs of count one of the indictment, which in substance assert that the corporate defendant, the Fellowship Press, from December 8, 1941, to the date of the indictment, published certain periodicals, among which was a magazine called "The Galilean Magazine," and a pamphlet entitled "We Fight for This Republic Only!" These publications were published and circulated during the months of December, January, February, and March, 1941–1942; that defendant, William Dudley Pelley, was the author-publisher of these publications, and the president of the corporation, and defendant, Lawrence A. Brown, its secretary; that from December 8, 1941, to the date of the indictment, the United States was at war with the government of Japan, and from December 11, 1941, was at war with Germany and Italy.

Following this language the allegations material to a consideration of the objections are herewith set forth. This tenth count covers forty-six printed pages of the transcript and we feel it is sufficient to abbreviate and eliminate much thereof.[1]

---

[1] We quote the portions of the indictment which contain the language appearing in the various issues of the Galilean, upon which the Government relied to establish the wilful making of "false reports or false statements with intent to interfere with the operation or success of the military or naval forces."

"The attack by Japanese flyers on Pearl Harbor, Sunday, December 7th, was by no means a cause. It was rather an effect. * * * It should be regarded as childish to seem appalled at the onslaught when it came. Rather we ought to be astonished that it was so long delay-

ed. * * * We have by every act and deed performable, aggressively solicited war with the Axis. The Axis, in the agency of Japan, has responded. Why not? Nothing is remarkable about such denouement. * * *

"We asked—through congressional approbation of the President's foreign policies—that we be permitted to participate in Europe's conflict. * * *

"Sagacious students of history will see in the whole cataclysmic drama the beginning of the inevitable showdown as to whether or not world-wide predatory Materialism shall dominate the behavior

of nations * * *. The present political officialdom of the United States has elected to declare this Republic as being for the contest on the side of the commercial and financial status quo.

"Apparently receiving the American proposals as somewhat in the light of insult, and further feeling that there was little to be gained by continuing the 'conferences,' the Mikado's Government declared war and at once attacked us * * *. To the Japanese, the continued existence of the imperial family symbolizes a nation that has never been conquered * * *. If ever a proud and fearless people existed on earth who should have been approached with the acme of tact and diplomacy, it was the Japanese * * *.

"Shall we have an honest war? * * * Nothing is going to provoke more rancor now than for the average American to get the idea that his government is denuding his own country of war stocks * * *. If this continues to be the policy of the Administration and the integrity of the homeland suffers in consequence, prevalent officialdom will find cooperation by the rank and file progressively ragged.

"How Long a Time to the Peace Treaty? * * * It is entirely within range of logical possibilities that when Britain discovers the United States unable to provide for her own military necessities and those of England too, she will negotiate some sort of peace, at least with Germany and Italy.

"Join 'Em and Run 'Em. * * * To draft the manpower of the nation for war purposes, * * * creates internal chaos * * *.

"From all that Indianians can gather—unless they listen in on the foreign shortwave—the war seems to be less than thirty days old, and we are so busy defending Iceland and Iran that inglorious defeat stares us in the face in the battle of the glass-bottomed excursion boats off Catalina Island. * * *

"* * * the losses which Britain has taken in the Far East * * * may mean the end of the war. With Singapore gone, India must go, too * * * That means that Australia is quarantined for the Duration * * *.

"Word is freely bruited about the Midwest that Thailand * * * has cast in its lot with Nippon. More British 'lost facts'. If the report be correct, the Burma Road becomes an alley. * * * This automatically dispatches Kai-shek to his ancestors. * * *

"* * * The whole war may be over, in fact, before the Average American comes to grasp it.

"There may not be a white man left west of Guam by next St. Patrick's Day * * *. It is tough but it is fact!

"* * * From North Carolina to Seattle, * * * you can travel in these Mobilizing Moments, and hear scarcely a word of condemnation of the Nipponese, Germans or Italians. * * * But there seems to be little controversy about the fact that inasmuch as Mr. President chose to surround himself with Zionists and a fearful war resulted from their counsels, they could have stopped the United States from participating in it, had they so elected. But provenly they did not do so. Therefore the responsibility is directly up to them. * * *

"* * * It is futile to plead that American territory and property were wantonly attacked in the Hawaiias. The attack obviously resulted from a baleful and provocative diplomacy. * * *

"Propaganda * * * may have it to appear that the Nipponese committed a series of hostile acts against * * * the United States in bombing Pearl Harbor and sinking our warships. Such propaganda may suffice to inflame a nation against a foreign foe * * *. It will, on the other hand, scarcely stand the critical investigation of dispassionate historians.

"By so conducting a nation's foreign policy that another nation sees no honorable escape but recourse to the sword, makes the inhibiting or provoking nation just as guilty in the situation as the nation that finally dispatches its bombers or warships to decide the issue by force of arms. * * *

"Military history * * * attests that when a major power grabs the initiative * * * of conflict, it proceeds to dictate the course of that war to the end. And it likewise dictates the essence of the peace.

"The cost of provocative New Deal diplomacy to the American Republic after nearly a month of war, is Pacific naval and territorial disaster. It may be distasteful to a nation that has won every * * * war * * * but there can be such a thing as a nation's taking such terrific body blows at the beginning of a fight that it never has opportunity to repair the opening damage. * * *

"Of course, getting gracefully out of the war * * * means meeting the conditions that our foes may be in a position to impose if New Deal incapacity results in graver catastrophes. But the nation may not be lacking in individuals with the Galilean acumen to manage it.

"Mr. President * * * might, easily, by the turn of a phrase * * * have

prevented the attack on Pearl Harbor * * *.

"Rapidly conditions are accruing in the United States * * * where no man can buy or sell unless he have a priorities number to obtain him materials. This is naught but enforced acquiescence to the dictates of Bestial Materialism.

"What truly is happening is, that the nations of the whole world have lined up * * * into two stupendous camps * * * Christian and Anti-Christian, Aquarian and Luciferian * * *. The United States has thus been maneuvered (into the Antichristian and Luciferian) because of overwhelming numbers of Judaists infiltrated into our current political Administration. * * *

"Today as a people we have no conviction deep down in our hearts that it is possible to whip successfully all the nations of Europe and Asia as at present aligned and with their past two-year record of military * * * accomplishments as an edge on us; we are bankrupt, cowed and disgruntled as a people, with no personal reserve to fall back upon * * *.

"The nation, by poll, was eighty percent against this involvement before * * * Pearl Harbor. Nowhere is there evidence that this percentage has actually changed.

"* * * The first reaction of the sedate and sensible citizen to the January 6th Presidential address is one of exasperation and despair. However, let us keep our poise.

"* * * There is not the slightest enthusiasm anywhere in all America for this war—with the sole exception of the Jewish ghetto sections of our swollen cities. And those ghettos will not fight. Gentile boys from factory and farm must do the fighting.

"* * * the nation that lets its detman brag of making 185,000 airplanes, hasn't got the rubber to equip even the neighborhood's laundry and butcher cart.

"To the moment, it still remains 'Mr. Roosevelt's War.' He has by no means 'sold' the American people on the idea that it is the vital conflict of the American Republic. The vital conflict of the American Republic comes when the Mikado's troops land in Alaska, put it under their military rule, and start down through British Columbia, to Washington * * *. We shall probably rush troops into those areas to give them challenge. Our boys * * * shall stand against them with a paper marked 'rifle' and another paper that is marked 'tank.'

"* * * It is Nippon we must reckon with. Hitler is an absurdity in the face of this vaster Oriental menace. * * *

With the Nipponese controlling our western coast, mayhap Hitler will be welcomed not as enemy but as friend!

"* * * even the most biased observer is forced to admit that strange new energies and capabilities have come to demonstration in Germany and Japan—Germany in Europe and Japan in Asia. * * *

"* * * the breaking of winter in Russia is going to reveal to * * * Americans what a colossal program of lies, deceits, false reports, and bogus news communiques they received, in 'information' coming from the eastern battle fronts concerning the Russian thrashing of Hitler's Germans.

"* * * The system of American defense seems to be to infiltrate the draftees into the British armies and forces abroad and let them get their training under battle conditions.

"Promiscuous criticism of the war effort or * * * leadership is not going to alter the personnel or behavior of the national leaders. The thing that is going to do that will be the action of the cataclysm as the United States proceeds to feel its effects. * * *

"It is probable that the only terms of negotiation to which Mr. Hitler will listen, will be the unqualified surrender of the British fleet—knowing that unless it is scuttled, he will get it in the end by another year of concentrated fighting anyhow. * * *

"The typical American who has something in his skullcase other than sawdust or cement, is disclosing by his private conversation * * * that he is getting utterly fed up on the clique seeking to prosecute this war on a basis of 'social gains,' and is reaching a mood of civic surliness where unwittingly he gloats when any of the Axis Powers report success abroad—even against our own forces. * * *

"To rationalize that the United States got into the war because of an unprovoked attack on Pearl Harbor, is fiddlefaddle. Unprovoked, indeed! All Americans are not fools!

"This fantastic notion of carrying the Four Freedoms, whatever they may be, to all the nations of the earth, is saying in effect: 'We propose to impress the American Way of Life upon you whether you like it or not.' Hitler expresses the same sentiment when he is alleged to declare: 'We propose to impress the Nazi Way of Life upon you whether you like it or not.' What's the difference between the two, excepting that one is ours and the other Germany's. * * *

"There is not a shred of evidence anywhere in the whole military picture that the so-called United Nations are not going to lose the war—according to current

The acts and words which constitute the bases of the criminal charges of the other counts are set forth in the margin.[2]

*The Issues.* Reversible error is charged, because:

(1) Women were excluded from serving on the grand jury which returned the indictment.

(2) Two special assistants to the Attorney General, who aided the District Attor-

---

performances—if indeed they have not lost it already. * * *

"Incidentally, we already have enough dunderheads on this side of the Atlantic. That is why American morale at the current moment is growing increasingly sour.

"Hitler, in cleansing the Germanic bloodstream of this inferior infusion, performs a vast service not only to the German-Xanthrochroic nationals but to world-humanity in general—and is rewarded with political and military ascendancy and an overlordship of all decadent Europe. * * * The best that maintains in Xanthrochroic culture, therefore, assumes a leadership role in the Occident * * *.

"The fact that men of any nation have to be drafted for a war, shows one of three things—The mass of the citizens disapprove of such war; The nation has suffered a decadence of morale prompting its males not to concern themselves with the public interest; or—The populace senses that settlement of differences could be arrived at by some other course than a destructive resort to arms. * * * "

[2] Count 1: Galilean, Dec. 22, 1941:

"We have by every act and deed performable aggressively solicited war with the Axis."

Count 2: Galilean, December 29, 1941:

" * * * This war, into which intentionally-bad diplomacy seems to have driven the sons of America's plain people—after electing a President on the pledge that he would not let it happen—is apparently the only way by which certain great social, political and financial abuses could ever be brought to head and cure."

" * * * From North Carolina to Seattle, Washington, you can travel in these Mobilizing Moments, and scarcely hear a word of condemnation of the Nipponese, Germans or Italians."

Count 3: Galilean, Jan. 5, 1942.

"It is futile to plead that American territory and property were wantonly attacked in the Hawaiias. The attack obviously resulted from a baleful and provocative diplomacy which appeared to neglect no opportunity to make actionist enemies of all major countries on the globe by England.

" * * * But with the war less than thirty days old and a third of our battle armada already destroyed in the Pacific, the possibility seems large that by the

time '43 rolls around, entirely different sets of men may be in political control of both the United States and England.

" * * * It is a *fact* that *nobody* in the whole United States had a flicker of feeling—one way or another—against Japan or Hitler, excepting racial blocs of refugees, evicted from their financial sinecures abroad. * * * "

Count 4: Galilean, Jan. 12, 1942.

" * * * we (the United States) are bankrupt."

Count 5: Galilean, Jan. 19, 1942.

" * * * There is not the slightest enthusiasm anywhere in all America for this war—with the sole exception of the Jewish ghetto sections of our swollen cities. And those ghettos will not fight. Gentile boys from factory and farm must do the fighting."

Count 7: Galilean, Feb. 16, 1942.

"The typical American who has something in his skullcase other than sawdust or cement, is disclosing by his private conversation in home, office and barbershop that he is getting utterly fed up on the clique seeking to prosecute this war on a basis of 'social gains,' and is reaching a mood of civic surliness where unwittingly *he gloats* when any of the *Axis Powers report success abroad —even against our own forces.*

"To rationalize that the United States got into the war because of an unprovoked attack on Pearl Harbor, is fiddle-faddle. Unprovoked, indeed! All Americans are not fools!

" * * * the insolent and dictatorial attitude taken toward us by both Britishers and Judaists, and the emasculation of our military and naval forces that Germanic Europe may be crushed in the interests of English imperialism and revitalized Zionism, spreads the subconscious realization that this is truly a war of foreign accommodation and convenience, and America's role is neither rational nor honest." (Italics ours.)

Count 8: Galilean, Feb. 23, 1942.

" * * * No realist in his senses would contend that there is unity in this country for the war's prosecution. There is nothing of the sort. A couple of weeks in Indiana would dispel such illusion."

Count 9 (similar to count 7).

Count 11. This count charges the obstruction of the recruiting service by the publication of the false utterances quoted in the preceding counts.

Count 12. The conspiracy count.

ney, were improperly permitted to appear before the grand jury.

(3) The counts of the indictment were ambiguously and defectively stated, in that they did not allege the name of any person who was influenced by the publications, or disclose the danger by which anyone could be influenced by such statements, and the counts were merely couched in general, statutory phraseology. It is also claimed no specific intent was shown on the part of the defendants to influence the armed forces, nor actual obstruction of recruiting. And finally, the indictment failed to point out wherein the statements were false.

(4) The statements set forth in the indictment are not upon their faces seditious, for they consist of opinions, predictions, criticisms, arguments, and "loose talk."

(5) Intent to commit the crimes was not sufficiently alleged—"the conclusion of intent could not supplant facts disclosing *how* they intended to so do and *by what means* the intent was to be carried out."

(6) Certain evidence relative to Pelley's pre-war activities with the "Silver Shirts" was received; also a Government witness testified to the close resemblance between defendants' publications and the fourteen chief propaganda themes of the Axis' powers.

*The Pleadings.* ·Defendants filed pleas in abatement, motions to quash, demurrers, and bills of particulars, all on the grounds above enumerated. All such motions were overruled.

*The Facts.* The evidence disclosed that the principal criminal publication, the Galilean, first issued in the fall of 1941, had a subscription list of from 1,200 to 1,500, and that from 3,500 to 5,000 copies were issued and distributed throughout the whole United States. The other document, "We Fight for This Republic Only," which was a reprint of articles appearing in the Galilean, circulated to the extent of about five to six thousand copies, distributed widely over the United States. There was a multitude of other articles which we need not refer to, since the indictment is predicated chiefly upon the articles appearing in the weekly issues of the Galilean, *after the declaration of war.*

The Government on the trial offered testimony to establish the falsity of the published statements—which fact was sine qua non to the existence of the offense. The nature of the published statements was such that their refutation was not easily achieved. Some of them were generalities with insidious connotations, such as " * * * you can travel in these Mobilizing Moments, and scarcely hear a word of condemnation of the Nipponese, Germans or Italians," and "No realist in his senses would contend there is unity in this country for the war's prosecution," and "we are bankrupt."

Yet the Government attempted, and, apparently to the jury's satisfaction, succeeded in proving the falsity of each and every statement. It proved the Government's solvency by the testimony of a banker who gave the assets and liabilities of the Government and of the people. It proved the lack of pro-Axis public opinion and the existence of national unity, by the testimony of public reaction as disclosed to salesmen traveling around the country, after the declaration of war.

*Intent.* To prove the existence of evil intent on the part of the defendants, the Government first disclosed the pre-war activities of defendant Pelley (the admissibility of this evidence will be discussed later) first as the creator of a widely publicized nation-wide Silver Shirt organization, then as candidate for President in 1936 on his own ticket, the Christian Party. His pro-Axis bent was overwhelmingly demonstrated in this campaign, and in his advertising to German-Americans, the German ancestry of his wife, and his genuine admiration of the Hitler regime. A search of his home uncovered an extensive library of German, Italian, and Japanese originated propaganda. The Government proved by scientific research and analysis that the utterances of Pelley in the Galilean were consistent and almost identical with the fourteen major themes of German propaganda. Dr. Lasswell testified that of the total of 1,240 statements in the 157 articles of the Galilean, *1,195* statements were consistent with and suggested copying from the °German propaganda themes, and only *45* were not in harmony with them. In making these comparisons, the witness examined, only, issues of the Galilean after war was declared. In the margin are the themes referred to.[3]

---

[3] Theme No. 1. The United States is internally corrupt. That is to say, there is political and economic injustice, war profiteering, plutocratic exploitation.

The argument that proof of intent is lacking hardly needs consideration. In time of war, when success depends on unified national effort, abiding loyalty, and unremitting patriotism, one who broadcasts falsely, as verities, misstatements of the country's continued failure in battle, asserts that it is destitute of defenses, is bankrupt, that it has prejudiced and incompetent leadership, weak and defecting allies, disunity in allied nations and in the United States itself, and extols the virtues of the enemies—cannot successfully challenge the verdict of a jury which finds him guilty of a crime, one essential element of which was a criminal intent to interfere with the operation or success of the military or naval forces of the United States,— or to promote the success of its enemies. It is impossible to account for defendants' publication of these articles and this magazine, save, as found by the jury, on the basis of the existence of a criminal intent.

For it is hardly conceivable that a writer or speaker would have written such propaganda, at a time when his country was at war, save as he entertained the hope of weakening the patriotic resolve of his fellow citizens in their assistance of their country's cause. No loyal citizen, in time of war, forecasts and assumes doom and defeat and futility of his country's fight, when his fellow citizens are battling in a war for their country's existence, except with an intent to retard their patriotic ardor in a cause approved by the Congress and the citizenry of this nation. So the jury evidently believed, and so spoke through their verdict. We can not say they erred in their assumptions nor can we say the evidence was lacking to support their conclusion.

*Necessity for Proof of Actual Harm to War Effort.* Defendants claim there was no allegation in the indictment, or proof, of actual harm to the war effort, or recruiting—that mere proof that some soldiers were in possession of the magazine or that the magazine was distributed among men and women eligible for service, was not sufficient. This contention, we must reject. The statute contains no such requirement. It says: "Whoever, when the United States is at war, shall willfully make or convey false reports or false statements with *intent to interfere* with the operation or success of the military or naval forces of the United States or to promote the success of its enemies and * * * shall willfully cause or attempt to cause insubordination * * *."

Communist sedition, Jewish conspiracy, and spiritual decay within the United States.

Theme No. 2. The foreign policies of the United States are morally unjustifiable. That is to say, they are selfish, bullying, imperialistic, hypocritical, and predatory.

Theme No. 3. The President of the United States is reprehensible. That is to say, he is a warmonger and a liar, unscrupulous, responsible for suffering, and a pawn of Jews, Communists, or Plutocrats.

Theme No. 4. Great Britain is internally corrupt. That there is political and economic injustice, war profiteering, plutocratic exploitation, Communist sedition, Jewish conspiracy, and spiritual decay within Great Britain.

Theme No. 5. The foreign policies of Great Britain are morally unjustifiable. That is to say, they are selfish, bullying, imperialistic, hypocritical and predatory.

Theme No. 6. Prime Minister Churchill is reprehensible. That is to say, he is a warmonger and a liar, unscrupulous, responsible for suffering, and a pawn of Jews, Communists, or Plutocrats.

Theme No. 7. Nazi Germany is just and virtuous. That is, its aims are justifiable and noble; it is truthful, considerate and benevolent.

Theme No. 8. The foreign policies of Japan are morally justifiable. That is to say, Japan had been patient, long suffering; it is not responsible for war.

Theme No. 9. Nazi Germany is powerful. That is to say, Germany has the support of Europe; it possesses the manpower, armaments, materials, and morale essential to victory.

Theme No. 10. Japan is powerful. That is to say, it possesses the manpower, armaments, materials, and morale essential to victory.

Theme No. 11. The United States is weak. That is to say, it lacks the materials, manpower, armaments, and morale essential for victory.

Theme No. 12. Great Britain is weak. That is to say, the British Empire is collapsing; and it lacks the necessary materials, manpower, armaments, and morale.

Theme No. 13. The United Nations are disunited. That is to say they distrust, deceive, envy, and suspect each other.

Theme No. 14. The United States and the world are menaced by Communists, Jews, Plutocrats.

It does not require *accomplishment* of the criminal object. Its phraseology is carefully worded to avoid such a construction. It condemned false war utterances whether or not they happened to be successful, or whether or not they could be *proved* to be successful,—a matter which might be hard or impossible to prove. It aimed at efforts and doubtless one of its objects (and results) was to prevent further and bolder efforts by the saboteur.

The Government categorized the Axis and Japanese propaganda into fourteen general topics, each of which constituted a theme upon which the foreign propagandist elaborates. One subject was the theme of one day's broadcast, another subject might be chosen the next day. They are quoted above in the margin.

The Government used an expert witness who analyzed the articles which appeared in the Galilean, or in the pamphlets which defendants published and circularized. The similarity between these articles and the treatises or discussions of the themes, above referred to, was then pointed out (and tabulated). The jury was thus permitted to get a better understanding of the intent which prompted Pelley in distributing what the jury could have found was secondhand Axis propaganda. This evidence was receivable for a double purpose. It shed light on defendants' intentions. It also supplied evidence of the making of false reports or statements which gave the jury a basis for a verdict that defendants were "interfering" with the "operation or success" "of the military forces" of the United States.

Not every false statement affords the basis of a charge of violating this section of the statute. Not even when an evil intent is back of the false words, may there always be a conviction. The false words must be considered. Their harmlessness, or their poison (or ability to poison), must be studied. In the instant case, there is no doubt as to their poisonous character and of their ability to poison those who might be eligible to draft, etc. Nor need we spend much time deliberating over their falsity or the criminal intent of their author or sponsor. The jury, not the court, decided these questions and we find the evidence supported their verdict.

Most every question which could arise over the application of the Espionage Act was settled by the Supreme Court during the War of 1917-18. We quote from three decisions.

"If that [opposition of the war then in progress] was intended and if, in all the circumstances, that would be its probable effect, it would not be protected by reason of its being part of a general program and expressions of a general and conscientious belief. * * * Evidence that the defendant accepted this view and this declaration of his duties at the time that he made his speech is evidence that if in that speech he used words tending to obstruct the recruiting service *he meant that they should have that effect."* Debs v. United States, 249 U.S. 211, 215, 216, 39 S.Ct. 252, 253, 63 L.Ed. 566.

In Pierce v. United States, 252 U.S. 239, 249, 40 S.Ct. 205, 209, 64 L.Ed. 542, it was said: "It was shown without dispute that defendants distributed the pamphlet—'The Price We Pay'—with full understanding of its contents; and this of itself furnished a ground for attributing to them an intent to bring about, and for finding that they attempted to bring about, any and all such consequences as reasonably might be anticipated from its distribution. If its probable effect was at all disputable, at least the jury fairly might believe that, under the circumstances existing, it would have a tendency to cause insubordination, disloyalty, and refusal of duty in the military and naval forces of the United States; that it amounted to an obstruction of the recruiting and enlistment service; that it was intended to interfere with the success of our military and naval forces in the war in which the United States was then engaged. Evidently it was intended, as the jury found, to interfere with the conscription and recruitment services * * * calculated to discourage the young men from entering the service; to arouse suspicion as to whether the chief law officer of the government was not more concerned in enforcing the strictness of military discipline * * * and to produce a belief that our participation in the war was the product of sordid and sinister motives, rather than a design to protect the interests and maintain the honor of the United States."

"An indictment setting forth a publication alleged to have been made with intent to hinder the prosecution of the war, contrary to the Espionage Act * * * is sufficient if the terms of the publication are such that, in the light of the time and cir-

cumstances attending its publication, reasonable men could deduce therefrom an intention to cause insubordination * * *." Stokes v. United States, 8 Cir., 264 F. 18.

■ *Sufficiency of the Indictment.* The alleged ambiguity and vagueness of the indictment are an empty challenge. We can conceive of no more easily worded count than one charging intentionally false utterances in time of war. The precise quotation of the offending statement pins down the illegal act to an exactness rarely achievable in the charging of crimes. When the inquiry is over false statements such as here relied on and the added allegation of criminal intent is established, then the charge in the words of the statute etches the crime in terms incapable of further clarification, and completely apprises the defendants of the charges which they have to meet and refute. See Martin v. United States, 9 Cir., 264 F. 329; United States v. Sugarman, D.C., 245 F. 604; Wolf v. United States, 8 Cir., 259 F. 388; Coldwell v. United States, 1 Cir., 256 F. 805; Anderson v. United States, 8 Cir., 264 F. 75; Stokes v. United States, 8 Cir., 264 F. 18; Dierkes v. United States, 6 Cir., 274 F. 75; Sonnenberg v. United States, 9 Cir., 264 F. 327; Goldstein v. United States, 9 Cir., 258 F. 908; Stephens v. United States, 9 Cir., 261 F. 590; Debs v. United States, 249 U.S. 211, 39 S.Ct. 252, 63 L.Ed. 566; Kumpula v. United States, 9 Cir., 261 F. 49; Balbas v. United States, 1 Cir., 257 F. 17—all cases involving indictments in espionage cases.

■ *Character of False Statements.* It is urged that "The publications * * * are not upon their faces seditious, for they consist of opinions, criticisms, arguments and loose talk." The trouble with this position is that the readers of the Galilean Magazine were not so candidly informed of the true character and value of the statements made. When it said, "We (the United States) are bankrupt," it was stated as a fact, not an opinion or conclusion. Such is also true as to these statements,—"There is not the slightest enthusiasm *anywhere in all America* for this war," "We have by every act and deed performable, aggressively solicited war with the Axis," "* * * We are so busy defending Iceland and Iran that inglorious defeat stares us in the face in the battle of the glass-bottomed excursion boats off Catalina Island," "There may not be a white man left west of Guam by next St. Patrick's Day in the morning (1942). It is tough, but it is *fact*," " * * * You can travel in these Mobilizing Moments, and hear scarcely a word of condemnation of the Nipponese, Germans or Italians. What you do hear is the ominous growl," "It is futile to plead that American territory and property were wantonly attacked in the Hawaiias" "The nation, by poll, was eighty per cent against this involvement before the first bomb dropped on Pearl Harbor. *Nowhere* is there evidence that this percentage has actually changed."

Further quotation of these statements is unnecessary to prove they were announced as definite or inevitable facts, not the personal "opinions" or loose talk of the author. See Debs v. United States, 249 U. S. 211, 39 S.Ct. 252, 63 L.Ed. 566.

■ The question of what constitutes seditious utterances was considered and settled in Schenck v. United States, 249 U.S. 47, 39 S.Ct. 247, 249, 63 L.Ed. 470. The part applicable to this case was so admirably stated in the opinion in that case that we quote therefrom: "We admit that in many places and in ordinary times the defendants in saying all that was said in the circular would have been within their constitutional rights. But the character of every act depends upon the circumstances in which it is done. Aikens v. Wisconsin, 195 U.S. 194, 205, 206, 25 S.Ct. 3, 49 L. Ed. 154. The most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre and causing a panic. It does not even protect a man from an injunction against uttering words that may have all the effect of force. Gompers v. Buck's Stove & Range Co., 221 U.S. 418, 439, 31 S.Ct. 492, 55 L.Ed. 797, 34 L.R.A.,N.S., 874. The question in every case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent. It is a question of proximity and degree. When a nation is at war many things that might be said in time of peace are such a hindrance to its effort that their utterance will not be endured so long as men fight and that no Court could regard them as protected by any constitutional right. It seems to be admitted that if an actual obstruction of the recruiting service were proved, liability for words that produced that effect might be enforced. The statute of 1917 in section 4 * * *

punishes conspiracies to obstruct as well as actual obstruction. If the act (speaking, or circulating a paper), its tendency and the intent with which it is done are the same, we perceive no ground for saying that success alone warrants making the act a crime."

**Exclusion of Women from Grand Jury.** It is conceded there were no women on the grand jury, and that qualified women did reside in the district.

The proof showed that names of persons qualified to act as jurors were obtained from the state circuit judges who were asked to submit "the names of *persons* qualified for jury service," possessing the qualifications of jurors in accordance with the requirements of the Supreme Court of the State. *Before* this time, the request had been for *"men"* jurors. Three hundred names were supplied by the state circuit judges in response to the request for "persons" qualified to act, and there is no evidence that there were no women among the names supplied, nor that their names were not placed in the box. It is agreed that the names of the jurors were drawn in strict accordance with the law.

It is worthy of note, also, that no prejudice to defendants' cause was shown, nor is any inferable, because of the absence of women on the grand jury, as might readily exist where all persons of defendants' race or creed were intentionally excluded.

In Wuichet v. United States, 8 F.2d 561, 562, the Sixth Circuit Court of Appeals said: "It is further contended that the motions to quash the indictments should have been sustained. They were based on the ground that the grand jury was illegally constituted, in that it was drawn from a box that did not contain the names of women. * * * It is of course true that discrimination in the selection of a jury against qualified jurors because of their race is, as to one belonging to the excluded race and put on trial before a jury thus selected, a denial of the equal protection of the law. * * * That, however, is not this case. There was no unlawful discrimination in the selection of the jury of which defendant could complain. If there was irregularity, it did not affect the competency of the individual jurors, and it was incumbent on defendant, if he desired to avail himself of that question, to raise it before pleading to the merits. * * * This is not a case of discrimination affecting defendant; at most it is an irregularity without implication of injury. It was for defendant to show prejudice to his rights. [Citing and quoting from several Supreme Court cases.]"

**Presence of Assistants Attorney General Before Grand Jury.** Another error assigned was based on the presence of two assistants attorney general during the deliberations of the grand jury. It is claimed this was illegal, because they took no oath as district attorneys and "no such state of affairs existed in the district" as warranted the Attorney General in causing them to appear.

These attorneys were duly authorized and deputized to act as assistants attorney general in the trial of this case, and they took the proper oath to act as such. A statute authorizes this use of assistants attorney general in other districts than that in which they reside. It provides: "The Attorney General or any officer of the Department of Justice, or any attorney or counselor specially appointed by the Attorney General under any provision of law, may, when thereunto specifically directed by the Attorney General, conduct any kind of legal proceeding, civil or criminal, including grand jury proceedings and proceedings before committing magistrates, which district attorneys may be by law authorized to conduct, whether or not he or they be residents of the district in which such proceeding is brought." 5 U.S.C.A. § 310.

The cases which are cited by defendants in support of their position concerned situations existing *before* the enactment of this statute.

*Admissibility of Certain Evidence.* Objections were made to the admissibility of so-called "hearsay" evidence to refute the truth of the statements charged by the indictment to be false—such as public opinion on the war, unity of the people, pro-Axis leaning of the public, etc. Also, the testimony of Dr. Lasswell, that the Galilean contained statements unanimously in accord with the present German propaganda themes—which conclusion he reached after extensive search, and preparation of charts. Also objected to was the evidence concerning the decidedly pro-Axis proclivities of Pelley prior to the declaration of war, particularly as manifested in the "Silver Shirts" organization, and his candidacy for President on the Christian Party.

■ We have no doubt as to the admissibility of all this evidence, if only to show the background from which the intent might be better judged. While we do not believe the utterances to have even a glimmer of ambiguity which might redeem their obvious connotation, still it is not amiss, in a trial before the jury, to bring home to them the real and undoubted intent of the maker of their pronouncements and his willfullness in making them. Moreover, they were admissible because "The character of every act depends upon the circumstances in which it is done. * * * When a nation is at war many things that might be said in time of peace are such a hindrance to its effort that their utterance will not be endured so long as men fight and that no Court could regard them as protected by any constitutional right." Schenck v. United States, 249 U.S. 52, 39 S.Ct. 247, 249, 63 L.Ed. 470.

■ It is argued in this case, as in similar cases, that defendants should not have been convicted, because others have expressed, in newspapers, pamphlets, and in oral statements, some of the words and ideas appearing in the Galilean, and used as the basis of this indictment. It is sufficient to say that we are considering this case only. Whether others have been guilty of like violations, affords no legal excuse for the defendants.

*Appeal of Lawrence A. Brown.* We have no doubt from the record before us that Pelley was the helmsman of this crusade, and directed its course; defendant Brown's participation is secondary. It is, however, clear that there was a close association between the two in the preparation of the articles, for which Brown was assigned the historical and factual research work. He was an organizer and officer of the corporate defendant, which published these articles. He was stockholder and held the positions of Secretary, Vice President, and Director. He was cognizant of the content of these articles, and was in part responsible for their preparation, content, publication, and dissemination. He wrote enthusiastically of forthcoming articles from Pelley's pen, which he was to, and did, publish through the Fellowship Press. On January 7, 1942, he wrote "Friend of mine says Hitler will be in Moscow by May 21, 1942, and hope he is right."

He writes in February, 1942: "As I write Singapore is all but gone. Japanese have water reservoirs which tell the whole story. Australia papers are comparing Singapore to France's Maginot Line. Well, they say in 1942 what I was writing in 1940 in essence."

"A letter came in saying that the party was not fit to lace his (Pelley's) shoes— enclosing $10 for the defense fight—and he read it aloud and said, 'Larry (Brown), you have got to pay me more respect. * * *' He feels intuitively that the tide has turned and so do I."

Of his sentiment toward the enemy, Germany and the Japs, he writes after referring to Hitler being in Moscow in May, 1942, "That about spells end of Reds and British—the same thing in my mind—in Europe. Japan will doubtless not merely wipe up Far East in a few weeks to a couple of months, but will take Hawaii and Alaska and then try to invade California." "Churchill is in one hell of a fix. The impudent Nazis took a squadron of warships right through Dover Straits and lost 3 planes and British 43."

To establish participation in this alleged criminal conspiracy, it is sufficient that the jury be convinced by competent, substantial evidence, that Brown acted with Pelley to accomplish that which is condemned by the above-quoted Sections 3 and 4 of the Espionage Act.

■ When an unlawful end is to be effected and two or more persons, actuated by the common purpose of bringing about that end, work together therefor, both are conspirators, although the part which one plays is a subordinate one and it is executed at a remote distance from the other conspirator.

■ Nor is the degree of moral turpitude involved, a material factor. The roles played by the members of a conspiracy, vary. Some play minor parts,—are mere pawns, who have neither the intellect nor the boldness to conceive, or the mental acumen to execute, the criminal venture. Nevertheless, both may be parties to the conspiracy, and both, guilty. The punishment, as here, may, however, be different.

■ It was for the jury to pass upon the existence of the alleged conspiracy and also, whether Brown was a party to it. We think the evidence is ample to hold Brown on the conspiracy charge.

■ *Appeal of Fellowship Press.* Through the existence of this corporate in-

strumentality of the means of publication, was achieved the physical accomplishment of the perfidious articles, and their distribution. The charge against the corporation was proper and well grounded.

The judgment is affirmed.

MAJOR, Circuit Judge. I concur in the result.